KLUGER ASSOCIATES, INC., ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6036–74, 6037–74, 6039–74.     Filed March 16, 1978.

---

[1] Cases of the following petitioners are consolidated herewith: Kluger, Inc., docket No. 6037–74; David Kluger and Bertha Kluger, docket No. 6039–74.

*John J. O'Toole, Edwin Fradkin,* and *Samuel S. Starr,* for the petitioners.

*William M. Gross,* for the respondent.

Scott, *Judge:* Respondent determined the following deficiencies in petitioners' Federal income and personal holding company taxes:

| | | | Deficiencies | |
| | | Taxable year | | Personal holding |
| Docket No. | Petitioner | in issue | Income tax | company tax |
|---|---|---|---|---|
| 6036–74 | Kluger Associates, Inc | 9/30/66 | $308,773.82 | $228,075.48 |
| | | 9/30/67 | 116,104.15 | 197,036.99 |
| | | 9/30/68 | 86,519.00 | 223,183.75 |
| 6037–74 | Kluger, Inc | 5/31/67 | 98,081.93 | 87,131.26 |
| | | 5/31/68 | 53,287.44 | 56,819.09 |
| 6039–74 | David Kluger and Bertha Kluger | 1967 | 7,159.56 | — |
| | | 1968 | 29,420.47 | — |

Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision the following:

(1) Whether the system of record keeping employed by the petitioners in the sale of various securities from their portfolios satisfied the requirement of adequate identification set forth in section 1.1012–1(c), Income Tax Regs.; and

(2) If there was not adequate identification of the securities sold, (a) whether respondent correctly employed the first-in, first-out (FIFO) method in computing the basis of the securities sold by petitioners; and (b) whether respondent in computing

undistributed personal holding company income under section 545(b)(5), I.R.C. 1954,[2] of the corporate petitioners properly reduced their net long-term capital gain deductions by the income tax attributable to contested capital gains.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

At the time of the filing of the petition in docket No. 6036-74, petitioner Kluger Associates, Inc., maintained its principal place of business in New York, N. Y. At the time of the filing of the petition in docket No. 6037-74, petitioner Kluger, Inc., maintained its principal place of business in New York, N. Y. At the time of the filing of the petition in docket No. 6039-74, petitioners David and Bertha Kluger were residents of New York, N.Y. For the taxable years in issue, all petitioners timely filed Federal income tax returns.

Kluger Associates, Inc., was incorporated in 1947 under the laws of New Jersey. Kluger, Inc., was incorporated in 1962 under the laws of New Jersey. Both corporations employed an accrual method of accounting in maintaining their books and records. Kluger Associates, Inc., reports its income using a September 30 fiscal year. Kluger, Inc., files its tax returns using a May 31 fiscal year. Both corporations were personal holding companies engaged in the investment business, the purchase and sale of securities for their own accounts.[3] They invested primarily in listed common stock of public utility companies.

Petitioner David Kluger also bought and sold securities for his own individual account. Separate books and records were maintained for Kluger Associates, Kluger, Inc., and David Kluger. The same methods of bookkeeping and accounting for securities transactions were employed by all three petitioners. The business of all petitioners was conducted in one suite of offices in New York City.

Each petitioner maintained a standard double-entry system cash receipts, cash disbursements ledger and a general ledger. In

---

[2] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.

[3] Prior to 1950 David Kluger and Kluger Associates, Inc., were engaged in the textile business. Around 1950 David Kluger and his brothers, with whom he had been associated in the textile business, decided to abandon the textile business and enter the investment field.

addition, each petitioner maintained a subsidiary ledger to record sales and purchases of securities. In these subsidiary ledgers, separate sheets were maintained for each company whose securities were acquired by the petitioners.

On the subsidiary ledger sheets, purchases of securities are recorded on the top half of each sheet; sales are recorded on the lower half. When one of the petitioners purchased a security, pertinent information was taken from the stockbroker confirmation statements and recorded on the subsidiary ledger sheet maintained for that security. These confirmation statements were generally received 1 or 2 days after the purchase. Information taken from these statements and recorded in the subsidiary ledger included the type of security, the cost per share, the number of shares purchased, the total cost of the block of stock purchased, and the date of purchase.

Certificate numbers did not appear on the brokers' confirmation statements. The certificates were usually delivered 3 or more weeks after the purchase date. Certificates bore the date of issuance, which was generally 2 or more weeks after the purchase date. Petitioners usually received one certificate for every 100 shares of stock that they purchased. When the certificates were delivered, their numbers were sometimes recorded on the subsidiary ledger sheets by the bookkeeper. In many instances, however, the ledger sheets reflect no certificate numbers for the various blocks of stock purchased. Rather, they merely reflect that a particular number of shares was acquired at a specified price on a particular date.

Many of the companies in petitioners' portfolios split their shares, declared stock dividends, and underwent capital changes such as mergers which necessitated the exchange of old certificates for new ones or resulted in the issuance of additional certificates. When one of these events transpired, the bookkeeper adjusted the per share costs on the subsidiary ledger sheets to reflect the increased number of shares after each capital change. Certificate numbers of stock received as a result of a stock split or a merger were not recorded on the subsidiary ledger sheets, but these certificates were segregated from other certificates in the vaults where the stock certificates were kept.

Although some of each petitioner's stocks were held in brokerage accounts or as collateral, the majority of the certificates for stocks purchased by petitioners were kept in two

vaults in a bank across the street from petitioners' offices. The stocks of the three petitioners were not intermingled. Thousands of certificates were on hand at any given time. When bonus certificates were received as a result of a stock split, they were kept in a separate bundle from the original certificates. The original certificates were kept in a bundle with one rubber band. The certificates received as a result of a split were kept in a separate bundle held together by two rubber bands and placed next to the bundle of original certificates.

When mergers took place, shares of the absorbed company were exchanged for shares in the surviving company. If the petitioners already owned shares in the surviving company, the old subsidiary ledger sheet for the absorbed company was retained, but a change was made to reflect the new name and new number of shares. Consequently, in these instances there were two subsidiary ledger sheets for the surviving company. Certificates received as a result of mergers were kept in the vault in separate bundles with three rubber bands and placed beside other bundles of certificates of the surviving companies.

When David Kluger determined that he wanted to sell a security from his portfolio or from the portfolio of one of the corporate petitioners, he would select the security to be sold, call a broker, and make the sale. If he had purchased more than one lot of the security he decided to sell, he would select, by date of purchase and purchase price, the lot from which the shares were to be sold. He would then jot this information down on a slip of paper, which he would give to the bookkeeper.

Upon receipt of the stockbroker's sales confirmation, the bookkeeper entered the pertinent information, including the number of shares sold, the selling price, and the gain or loss, on the lower section of the subsidiary ledger sheet. In accordance with David Kluger's instructions, the bookkeeper then "keyed" the sales transaction on the lower half of the subsidiary ledger sheet with one or more entries in the purchase section on the top half of the ledger sheets.

The following illustrates this "keying" system:

On October 3, 1967, David Kluger determined that Kluger Associates, Inc., would sell 500 shares of Texas Gas Transmission stock at a price of 31¾. After calling the broker and making the sale, he referred to his personal records to decide which 500 shares he wanted to sell. He determined that he wanted to sell 200 shares purchased by Kluger Associates, Inc., on August 5, 1966, at a price of 27¾, 100 of a lot of 200 shares purchased on August 10, 1966, at a price of

27¾, and 200 shares acquired on November 21, 1966, at a price of 28. He gave this information to the bookkeeper and she computed the gain on the sale.

When the broker's confirmation arrived, the bookkeeper entered the information concerning the sale on the lower half of the subsidiary ledger sheet. As this was the eighth sale by Kluger Associates, Inc., of Texas Gas Transmission stock, the bookkeeper then placed the key number "8" in a column on the same line with the other information pertaining to the sale. Next, acting on the information supplied to her by David Kluger concerning which shares were to be sold, the bookkeeper found in the purchase section on the top half of the subsidiary ledger sheet the entries which corresponded to the shares David Kluger had told her he wanted to sell. Next to the entry corresponding to the 200 shares purchased on August 5, 1966, she entered the key number "8." She likewise entered the same key number next to the other blocks of stock which David Kluger had decided to sell. Key numbers were written in pencil; other entries on the subsidiary ledgers were in ink.

The personal records to which David Kluger had referred in determining which securities to sell did not contain any certificate numbers of the various shares. After entering the key numbers on the subsidiary ledger sheets, the bookkeeper would, when this information appeared on the subsidiary ledger sheets, furnish Mr. Kluger a list of the certificate numbers of the shares that he had selected for sale. If no certificate numbers appeared in the purchase section of the subsidiary ledger sheets, the bookkeeper had no way of knowing which certificates corresponded to that particular keyed sales transaction and could not, therefore, list any certificate numbers to furnish to Mr. Kluger.

In the course of auditing the petitioners' tax returns, the revenue agent obtained copies of stock transfer accounts from the companies whose securities were held by petitioners and from the transfer agents of these companies.[4] In checking these records against the information on the subsidiary ledger sheets when these sheets listed certificate numbers, he found that the certificate numbers of shares "keyed off" in conjunction with the various sales did not correspond to the certificate numbers of the shares actually transmitted for cancellation to the companies or their transfer agents subsequent to the sale. For example, in the October 3, 1967, sale of 500 shares of Texas Gas Transmission stock referred to in the previous example, Kluger Associates'

---

[4]Petitioner argues at some length that since this information was not obtained by the revenue agent originally but only after the case was referred back to him by a representative of the Appellate Division of respondent's Newark office, respondent's determination was made on a second examination. The further examination made by the revenue agent was so clearly not of petitioners' records that this matter needs no further discussion.

subsidiary ledger sheets indicate that two certificates representing 200 shares acquired August 5, 1966, bearing certificate numbers 57971 and 57972 should have been delivered to the broker and subsequently canceled by the company. The records of Texas Gas Transmission Corp. show that 500 shares of stock were turned in and canceled 10 days after the sale by Kluger Associates, Inc., but that none of the certificates surrendered bears either certificate number 57971 or 57972. None of the certificate numbers of the other shares "keyed off" on Kluger Associates' subsidiary ledger for the October 3, 1967, sale corresponds to the shares turned over to and canceled by Texas Gas Transmission near the time of the sale. The corporate records of Texas Gas Transmission indicate that two of the five 100-share certificates purportedly sold by Kluger Associates, Inc., on October 3, 1967, had been canceled by the corporation prior to the date of the October 3, 1967, sale. Another of the certificates allegedly sold in that transaction was not canceled until December of 1967, and the remaining two certificates were not canceled until 1969.[5]

Petitioners' records, when compared to the records of the companies whose stocks petitioners purchased or the transfer agents of those companies, show only the following instances of delivery for cancellation of the certificates representing the stock "keyed off" as having been sold. See table on page 932.

There are a few other instances in which it is unclear from the comparison of petitioners' records with the stock transfer records whether the certificates representing the "keyed off" stock were delivered, but as a general rule these records show that petitioners did not deliver the certificates whose numbers

---

[5]When certificate numbers appeared on petitioners' ledger sheets, the revenue agent checked the certificate numbers of the stock purportedly sold with the certificate numbers of the shares turned over to and canceled by the companies or their transfer agents shortly after the sale. If no certificate numbers appeared on the ledger sheets, the agent compared the date of purchase on the ledger sheets with the date of issuance on the records of the companies or their transfer agents.

At the trial petitioners' subsidiary ledger sheets were received in evidence. Also received were documents (Exhibit 16–I) stipulated to be "copies of stock transfer accounts and other information obtained by the revenue agent from the companies who issued the securities involved in this case or from their transfer agents." However not all the companies whose stock petitioners sold are included in the stipulated Exhibit 16–I. Because petitioners argued strongly that respondent had specifically during the trial pointed out only eleven discrepancies in the comparison of petitioners' ledgers and the stock transfer records, we examined in detail petitioners' subsidiary ledgers and the stock account records of the companies or their transfer agents. These records cover hundreds of transactions. Of all these transactions, our examination shows in only 16 instances did petitioners deliver the certificates corresponding to the shares "keyed off" on the subsidiary ledgers. In many instances the records are inadequate to show whether the shares "keyed off" were in fact delivered.

| Stock sold | Date of sale | Number of shares sold | Certificate numbers "keyed off" which were delivered[1] |
|---|---|---|---|
| **SALES BY KLUGER ASSOCIATES, INC.:** | | | |
| C&U Communications | Nov. 14, 1966 | 12,500 | 455; 498; 501; 502; 1714; 1715 |
| Commonwealth Telephone of Pennsylvania | Sept. 12, 1966 | 800 | 6235; 6236; 6237; 6238; 6239; 6220; 6221; 6268 |
| Consumers Power | Sept. 12, 1966 | 1,400 | 246734; 246735; 246736; 245687; 246083; 246084; 246876; 247633 |
| Consumers Power | May 9, 1967 | 500 | 263635; 263636; 263637; 263773; 263774 |
| General Telephone & Electronics | May 24, 1966 | 900 | 830172; 830173; 830174; 830175; 830176; 830177; 830178; 830179 |
| General Telephone & Electronics | Sept. 14, 1967 | 1,100 | 950986; 950987 |
| Hawaiian Telephone | Nov. 9, 1966 | 3,300 | 26151; 29187; 29188; 29189; 29190; 26397; 32972; 32973 |
| Mid-Continental Telephone | June 8, 1966 | 2,000 | 21382; 21383; 21384; 21385; 21386; 21387; 21388; 21389; 21390 |
| Ohio Edison | Sept. 7, 1966 | 200 | 78343; 78344 |
| Pacific Gas & Electric | Oct. 18, 1966 | 200 | 22123; 22124 |
| Telephone Service Co. of Ohio | Sept. 12, 1966 | 1,500 | 8095; 8096; 8097; |
| **SALES BY KLUGER, INC.:** | | | |
| Telephone Service Co. of Ohio | Sept. 1, 1966 | 500 | 7319 |
| Telephone Service Co. of Ohio | Nov. 15, 1966 | 1,100 | 10223; 10224; 10225; 10226; 10227 |
| Western Union | Jan. 3, 1967 | 1,700 | 356200; 356201; 356202 |
| **SALES BY DAVID KLUGER:** | | | |
| Rochester Gas & Electric | June 29, 1967 | 500 | 74918; 74919; 74914 |
| Rochester Gas & Electric | July 28, 1967 | 200 | 74196; 74917 |

---

[1] Each certificate is a 100-share certificate

corresponded to the certificates shown by the subsidiary ledger sheets as having been sold when certificate numbers were entered on these ledger sheets.

Upon discovering that in his view petitioners had been disregarding the certificate numbers when delivering certificates sold to their transferees, the revenue agent determined that petitioners had not been adequately identifying the securities sold and reconstructed their incomes for the years in issue using the first-in, first-out (FIFO) method in accordance with section 1.1012–1(c)(1), Income Tax Regs. In his FIFO computation, respondent's agent matched the earliest sales with the earliest acquired shares which petitioners had not claimed to have sold prior to the years in issue. Respondent's determination of each petitioner's taxable income as set forth in the notice of deficiency, which was based on his agent's computation, did not encompass a change in the cost basis of all the securities sales reported by any of petitioners. Where securities were held by brokers or others, as opposed to the securities held in the vault, it was determined that petitioners had met the requirement of specific identification and, in one instance, the revenue agent found that Mr. Kluger had delivered the certificate the ledger sheet indicated had been sold.[6] In other instances where the entire holdings in a particular security had been disposed of prior to the last year under examination, no change was made to avoid adjustments which only shifted income between years.

In his FIFO computation, respondent considered only costs applied during the taxable years in issue and did not disturb costs absorbed in prior years.

The reconstruction of petitioners' income by the application of FIFO necessitated a recomputation of the personal holding company tax liabilities of the corporate petitioners. In determining the undistributed personal holding company income of petitioners Kluger Associates, Inc., and Kluger, Inc., respondent adjusted their net taxable incomes by deducting, on account of capital gains, the excess of net long-term capital gains over short-term capital losses less the taxes of the corporate petitioners determined to result from the inclusion in income of such excess.

---

[6] A review of the revenue agent's computation which is in evidence shows that this unchanged sale was of 1,500 shares of stock of the Telephone Service Co. of Ohio sold by Kluger Associates, Inc., on Sept. 12, 1966.

Petitioners take the position that they correctly reported their income since their records were sufficient to identify the specific stock they sold. They argue that if their records are held not to be sufficient to identify the stock sold, respondent has incorrectly applied the FIFO method. Finally, the corporate petitioners contend that respondent erred in reducing the deduction on account of capital gains by the computed but not accrued tax applicable to those capital gains.

## OPINION

Section 1001(a) provides that the gain from the sale or other disposition of property is the amount realized less the adjusted basis of the property. Sections 1011 and 1012, insofar as here pertinent, provide that the basis of property sold is its cost to the taxpayer.[7] Where a taxpayer sells at one time all the stock he holds in a particular corporation or has acquired all stock he owns in one particular transaction, no problem exists in determining that taxpayer's basis in the stock he has sold. However, when a taxpayer has acquired stock of a corporation on different dates or at different costs and sells only a part of that stock, a problem arises as to the cost or basis of the stock which was sold.

Section 1.1012–1(c), Income Tax Regs., sets forth the rules governing the bases of stocks sold by a taxpayer who has acquired blocks of stock on different dates or at different costs. Subparagraph (1)[8] provides that the FIFO rule shall govern

---

[7]SEC. 1001. DETERMINATION OF AMOUNT OF AND RECOGNITION OF GAIN OR LOSS.

(a) COMPUTATION OF GAIN OR LOSS.—The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.

SEC. 1011. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

(a) GENERAL RULE.—The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis (determined under section 1012 or other applicable sections of this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses)), adjusted as provided in section 1016.

SEC. 1012. BASIS OF PROPERTY—COST.

The basis of property shall be the cost of such property, except as otherwise provided in this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses). The cost of real property shall not include any amount in respect of real property taxes which are treated under section 164(d) as imposed on the taxpayer.

[8]Sec. 1.1012–1 [Income Tax Regs.] Basis of property.

(c) *Sale of stock*—(1) *In general.* If shares of stock in a corporation are sold or transferred by a taxpayer who purchased or acquired lots of stock on different dates or at different prices, and the lot

unless the lot from which stock is sold can be adequately identified. That is, absent adequate identification of the lot from which the stock was sold, the basis of the stock sold shall be the basis of the first stock of the particular company acquired by the taxpayer.

Subparagraph (2) of section 1.1012–1(c), Income Tax Regs., defines "adequate identification" in the case of stocks held by the taxpayer, rather than by a broker:

(2) *Identification of stock.* An adequate identification is made if it is shown that certificates representing shares of stock from a lot which was purchased or acquired on a certain date or for a certain price were delivered to the taxpayer's transferee. Except as otherwise provided in subparagraph (3) or (4) of this paragraph, such stock certificates delivered to the transferee constitute the stock sold or transferred by the taxpayer. Thus, unless the requirements of subparagraph (3) or (4) of this paragraph are met, the stock sold or transferred is charged to the lot to which the certificates delivered to the transferee belong, whether or not the taxpayer intends, or instructs his broker or other agent, to sell or transfer stock from a lot purchased or acquired on a different date or for a different price.[9]

---

from which the stock was sold or transferred cannot be adequately identified, the stock sold or transferred shall be charged against the earliest of such lots purchased or acquired in order to determine the cost or other basis of such stock, and in order to determine the holding period of such stock for purposes of subchapter P, chapter 1 of the Code. If, on the other hand, the lot from which the stock is sold or transferred can be adequately identified, the rule stated in the preceding sentence is not applicable. As to what constitutes "adequate identification", see subparagraphs (2), (3), and (4) of this paragraph.

[9]Subparagraph (3) of sec. 1.1012–1(c), Income Tax Regs., is applicable with respect to stock left in the custody of a broker and subparagraph (4) only with respect to stock held by a trustee, executor, or administrator. Obviously neither of these subsections applies here. The few cases where petitioners' stocks were held by brokers are not involved in this case. However, since the parties argue with respect to the provisions of these sections, they are quoted below:

(3) *Identification on confirmation document.* (i) Where the stock is left in the custody of a broker or other agent, an adequate identification is made if—

(a) At the time of the sale or transfer, the taxpayer specifies to such broker or other agent having custody of the stock the particular stock to be sold or transferred, and

(b) Within a reasonable time thereafter, confirmation of such specification is set forth in a written document from such broker or other agent.

Stock identified pursuant to this subdivision is the stock sold or transferred by the taxpayer, even though stock certificates from a different lot are delivered to the taxpayer's transferee.

(ii) Where a single stock certificate represents stock from different lots, where such certificate is held by the taxpayer rather than his broker or other agent, and where the taxpayer sells a part of the stock represented by such certificate through a broker or other agent, an adequate identification is made if—

(a) At the time of the delivery of the certificate to the broker or other agent, the taxpayer specifies to such broker or other agent the particular stock to be sold or transferred, and

(b) Within a reasonable time thereafter, confirmation of such specification is set forth in a written document from such broker or agent.

Where part of the stock represented by a single certificate is sold or transferred directly by the taxpayer to the purchaser or transferee instead of through a broker or other agent, an adequate identification is made if the taxpayer maintains a written record of the particular stock which he

This provision is clear that with exceptions not here pertinent delivery of the proper shares is an essential element of an adequate identification. Delivery is the determinative factor in ascertaining which stocks a taxpayer has sold.

Although we have discovered no cases specifically upholding subparagraph (2) of section 1.1012–1(c) of the Income Tax Regulations, the rule stated therein is merely a variation of the principle enunciated by the Supreme Court in *Davidson v. Commissioner*, 305 U.S. 44 (1938). In that case the Court held that when a taxpayer intended to sell particular shares of stock and ordered his broker to sell those shares, he could not treat the shares he intended to sell as the shares sold if the broker delivered certificates representing other shares. Delivery, not intention, governed the identity of the shares sold.

Petitioners in this case do not attack the validity of section 1.1012–1(c)(2) of the Income Tax Regulations but argue that they have complied with the provisions of that regulation. We therefore do not have an issue in this case as to the validity of section 1.1012–1(c)(2) of the Income Tax Regulations but merely the factual issue of whether petitioners have complied with the provisions of that regulation.

Petitioners contend that despite a few isolated mistakes, David Kluger was delivering the specific shares he intended to sell. As we have found in our facts, the record does not support this contention of petitioners. Our comparison of petitioners' subsidiary ledgers with the transcripts and records of the companies whose stocks petitioners sold or their transfer agents shows that only in rare instances were the shares "keyed off" on the ledger sheets the same shares that were ultimately delivered to the transferees. While we found a few instances in which

---

intended to sell or transfer.

(4) *Stock held by a trustee, executor, or administrator.* Where stock is held by a trustee or by an executor or administrator of an estate (and not left in the custody of a broker or other agent), an adequate identification is made if at the time of a sale, transfer, or distribution, the trustee, executor, or administrator—

(i) Specifies in writing in the books and records of the trust or estate the particular stock to be sold, transferred, or distributed, and

(ii) in the case of a distribution, also furnishes the distributee with a written document setting forth the particular stock distributed to him.

Stock identified pursuant to this subparagraph is the stock sold, transferred, or distributed by the trust or estate, even though stock certificates from a different lot are delivered to the purchaser, transferee, or distributee.

petitioners did deliver the correct certificates, these were the exception and not the rule. From a review of the record, we conclude that petitioners were primarily concerned with delivering the proper number of certificates and not with delivering the specific certificates representing the shares "keyed off."[10] Petitioners' explanation of the discrepancies between their subsidiary ledgers and the corporate records is that when David Kluger went to the vault to retrieve a particular certificate and found it missing he would simply deliver a "twin," a certificate received in a stock split. As the "twin" would have the same cost basis and holding period as the original certificate, petitioners contend that it should make no difference that the certificate numbers did not correspond. The corporate records indicate that this may have been true in some instances. In many instances, however, the corporate records indicate that the shares delivered were not issued in the year the split occurred and could not have been "twins." Moreover, and perhaps more important, David Kluger was unable to explain why he would ever need to go to a vault in search of a share that was not there. Had the "keying" system been properly employed, the subsidiary ledger sheets would have indicated that particular shares had already been sold and removed from the vault, and there would have been no reason for Mr. Kluger to search the vault for previously sold shares.

In the many instances where certificate numbers were not recorded on the subsidiary ledger sheets, it would have been impossible to ascertain from the subsidiary ledgers exactly which certificates were the proper ones for delivery. Mr. Kluger's secretary testified that if no certificate numbers appeared on the subsidiary ledger sheets, she had no way to inform Mr. Kluger which certificates to pick up from the vault for delivery to the broker.

Petitioners argue that the regulations do not require that identification be accomplished by means of certificate number. This argument begs the issue. While it may be that petitioners could have devised a system for identifying shares sold by some

---

[10]The revenue agent testified that Mr. Kluger told him during the investigation that he was not concerned with delivering the specific certificates "keyed off" but merely the correct number of shares. Mr. Kluger denied that he had made this statement to the revenue agent. Regardless of whose recollection as to the statement was correct, the record as a whole indicates that in fact no effort to deliver the specific certificates "keyed off" was made.

means other than certificate number, in fact the system used by petitioners did not so identify the certificates. In some instances the records identified the certificates by number, but the identified certificate was usually not the certificate delivered in consummation of the sale.

Lastly petitioners argue that their subsidiary ledger sheets adequately identified by date of purchase and purchase price all the shares they sold. However, this record shows that petitioners simply did not deliver the shares "keyed off" on their ledger sheets.[11] As we have already stated, under section 1.1012–1(c)(2), Income Tax Regs., delivery of the proper certificate is a crucial element of an adequate identification.[12]

Petitioners further contend that respondent has not correctly applied the FIFO method to reconstruct their incomes. Although they did not submit an alternative computation, they argue that respondent's agent should have applied his FIFO analysis to all years after 1951, when petitioners first entered the investment field, despite the fact that absent the applicability of some special provision of law the collection of any deficiency or payment of any refund for these years might be barred by the statute of limitations. To apply the FIFO analysis to only 3 years of their business operations, they argue, generates unrealistic capital gain and distorts their incomes.

In our view, the method employed by respondent's agent to recompute petitioners' incomes was entirely reasonable with the exception of his failure to eliminate from the computation the fifteen additional instances where the records show that some or all of the proper certificates were delivered. To determine the FIFO cost of the shares sold, respondent's agent used the cost of the earliest acquired shares not "keyed off" on the ledger sheets prior to the years in issue. He made no change in the gain or loss as reported where securities were held by brokers or others and when all of a petitioner's holdings in a particular security were disposed of during the taxable years in issue. In one instance

---

[11]Petitioners argue extensively that since the system they used was originally set up by their accountant and had not been questioned in prior investigations by agents of respondent, it should be accepted as adequate. In our view these facts do not control whether petitioners complied with the provisions of sec. 1.1012–1(c)(2), Income Tax Regs.

[12]Petitioners recognize that under sec. 1.1012–1(c)(3), Income Tax Regs., delivery is a crucial element of identification. They take the position that this subparagraph is not applicable to them. They overlook the fact, however, that delivery is also essential under subparagraph (2), and this section clearly applies to petitioners.

where he found that the certificate the ledger sheet indicated had been sold had been delivered, he did not change the gain as reported. Petitioners pointed out no instances in which the proper certificates were delivered and our review of the evidence disclosed only 16 such instances, including the one that respondent's agent did not change. We hold that these sales which are listed in our findings were properly reported by petitioners and that respondent's computation should be revised accordingly. Otherwise, we find the computation used by respondent to be reasonable, and we hold that petitioners have demonstrated neither that respondent acted arbitrarily in reconstructing their incomes nor that their bases in the various stocks sold were higher than those found by respondent in his FIFO reconstruction of income.

The final issue concerns the personal holding company tax liability of petitioners Kluger Associates, Inc., and Kluger, Inc. These petitioners are personal holding companies subject to the tax on undistributed personal company income imposed by section 541. Having reconstructed these petitioners' incomes by use of the FIFO method and having found that their incomes exceeded the amounts shown on their returns, respondent recomputed their personal holding company incomes and the taxes due thereon.

Section 545(b)(1) allows as a deduction from taxable income in determining undistributed personal holding company income the Federal income taxes accrued during the taxable year. Section 545(b)(5) allows as a deduction from taxable income the net capital gain for the taxable year, minus the taxes attributable thereto. Explaining the purpose of this later provision, the Second Circuit said in *Litchfield Securities Corp. v. United States*, 325 F.2d 667, 669 (2d Cir. 1963):

The rationale of this is that, the capital gains tax rate on individuals being no higher than it is on corporations, the stockholder derives no tax advantage from realization of such profits through the corporation, but that, since sec. 545(b)(1) already provides for deduction of all federal income taxes paid, the corporation would be permitted in effect to deduct the amount of its capital gains tax twice unless the deduction was reduced by the taxes "attributable" to such gain as defined in the second sentence of sec. 545(b)(5), the subject of this controversy.

A contested tax, such as the tax on capital gains resulting from respondent's reconstruction of petitioners' incomes, cannot

be accrued until the year the contest is resolved. *Dixie Pine Products Co. v. Commissioner*, 320 U.S. 516 (1944). Consequently, in computing the personal holding company incomes of petitioners Kluger Associates, Inc., and Kluger, Inc., respondent did not reduce their incomes under section 545(b)(1) by the amount of the taxes he determined in his notice of deficiency to be due as a result of his recomputation of their bases in the stocks they sold using FIFO. The revision of bases in stocks sold is the primary issue being contested by petitioners in this case. Nevertheless, respondent reduced the net capital gains deduction under section 545(b)(5) by the taxes he determined to be attributable to the excess capital gains.

Petitioners contend that the deduction for net capital gains under section 545(b)(5) should not be reduced by the taxes attributable to these capital gains because these taxes were not accrued during the taxable years in issue and were therefore not deductible from their taxable income under section 545(b)(1). They contend that reduction of the capital gains deduction by the taxes attributable to these gains when no parallel adjustment is allowed under section 545(b)(1) constitutes a tax upon a tax, a result which they characterize as "harsh" and "unintended."

In *Ellis Corp. v. Commissioner*, 57 T.C. 520 (1972), we considered, and rejected, an identical argument. In so holding in *Ellis*, we stated that where the tax has not accrued for purposes of the adjustment under section 545(b)(1), there is no double deduction for the taxes attributable to capital gains. Petitioners ask that we reconsider our holding in the *Ellis* case since it was the double deduction that the section 545(b)(5) adjustment for taxes was aimed at eliminating. Because of the intimation from some of the language in the *Ellis* case that the purpose of the section 545(b)(5) reduction for taxes attributable to capital gains was not well served when these taxes had not been accrued for purposes of the adjustment under section 545(b)(1), we have reconsidered our holding in that case as it would apply to the instant case. We conclude that the holding in the *Ellis* case is correct as applied to the facts in this case. Since when the contest in this case is concluded the taxes which are determined to be due by petitioners will accrue, those taxes will in the year of such accrual be deductible under section 545(b)(1) in computing petitioners' personal holding company taxes for that

year if petitioners remain personal holding companies. There is no indication in this record that Kluger Associates, Inc., and Kluger, Inc., have not remained personal holding companies. In fact, the clear indication from the record is that these companies were at the time of the trial still personal holding companies. In the year that the contest of tax involved in this case is concluded the taxes on capital gains for the years here involved would not be attributable to such gains during that year and therefore no adjustment for these taxes could be made under section 545(b)(5). Therefore, unless the deduction for capital gains under section 545(b)(5) has been reduced by the taxes attributable to such gains in the years here involved when the gains were realized, petitioners will have the benefit of a double deduction for the taxes applicable to such capital gains. Accordingly, the "logic" of the taxpayer's position referred to in the *Ellis* case is not present in the instant case since a double deduction would in fact occur in this case were we to adopt petitioners' position.

Finally, we agree with our holding in the *Ellis* case that we cannot ignore the significance of Congress' use of the two different terms: "accrued" in section 545(b)(1) and "attributable" in section 545(b)(5). Both the House and Senate Committee Reports accompanying the 1954 Code indicate that when Congress enacted section 545(b)(1), it was aware that contested taxes could not be accrued and deducted under section 545(b)(1).[13]

*Decision will be entered under Rule 155.*

---

[13]The following statements appear in the House and Senate Reports:

H. Rept. 1337, 83d Cong., 2d Sess. A176 (1954):

Section 545. Undistributed personal holding company income

Subsection (a) defines "undistributed personal holding company income," i.e., the amount which is subject to the personal holding company tax, * * *

In adjusting taxable income, subsection (b) provides that the following deductions are allowed:

(1) Taxes accrued during the taxable year. * * * In the case of contested taxes the accrual occurs in the year the contest is resolved (Dixie Pine Products Co. v. Commissioner, 320 U.S. 516).

* * * * * * *

(4) The excess of the net long-term capital gains over the net short-term capital losses. Under present law, the alternative capital gains tax is imposed in lieu of the income and personal holding company taxes. This adjustment reaches the same result. Inasmuch as the net long-term capital gain is excluded from taxable income, the alternative capital gains tax is not allowed as a deduction in computing undistributed personal holding company income.

S. Rept. 1622, 83d Cong., 2d Sess. 320 (1954):

Sec. 545. Undistributed personal holding company income

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Subsection (a) defines "undistributed personal holding company income," i.e., the amount which is subject to the personal holding company tax, \* \* \*

In adjusting taxable income, subsection (b) as amended by your committee, provides that the following deductions are allowed:

(1) Taxes accrued during the taxable year. \* \* \* The changes made in existing law include (a) an allowance of the deduction only in the taxable year in which such taxes accrue, \* \* \* . In the case of contested taxes the accrual occurs in the year the contest is resolved. (Dixie Pine Products Co. v. Commissioner, 320 U.S. 516).

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(4) The excess of the net long-term capital gains over the net short-term capital losses. Under present law, the alternative capital gains tax is imposed in lieu of the income and personal holding company taxes. This adjustment reaches the same result. A technical amendment by your committee to the House bill allows the capital gains tax as a deduction in computing undistributed personal holding company income but reduces the amount of the deduction for capital gains by the taxes attributable to such gains.

