RAYMOND J. BERAN and JEAN R. BERAN, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Beran v. Commissioner
Docket Nos. 2581-78, 2582-78, 2616-78.
United States Tax Court
T.C. Memo 1980-119; 1980 Tax Ct. Memo LEXIS 466; 40 T.C.M. (CCH) 163; T.C.M. (RIA) 80119; April 15, 1980, Filed Truman Clare, for the petitioners. 1a
Albert B. Kerkhove, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined deficiencies in petitioners' income tax, plus additions to the tax under section 6651(a)(1)[2] for failure to file tax returns and under section 6653(a) for disregard of rules and regulations, as follows: *469 Petitioner
Docket No.
Year
Deficiency § 6651(a)(1) § 6653(a)
Raymond and
2581-78
1973
$16,875.34
$0
$ 843.77
Jean Beran
Raymond Beran
2582-78
1975
1,814.48
453.62
90.72
Jean Beran
2616-78
1975
58,215.90
14,553.98
2,910.80
In his amended answer, Docket No. 2582-78 (Raymond J. Beran), respondent asserts that the deficiency should be increased by $8,569.53 and that the additions to the tax under secutions 6651(a) and 6653(a) should be increased by $2,142.38 and $428.48, respectively. Due to concessions by the parties, the issues remaining for decision are: 1. Whether petitioners correctly computed the gain on 1973 and 1975 sales of First National Bank of Belfield stock. 2. Whether petitioner, Jean Beran, is taxable on the 1975 sale of Crofton State Bank stock and, if not, whether petitioner, Raymond Beran, is taxable on that sale. 3. Whether petitioners are entitled to an interest deduction in 1973 for amounts paid on behalf of Automated Systems, Inc. 4. Whether petitioners are entitled to file a joint return for 1975. 5. Whether the addition to tax pursuant to section 6651 for failure to file a return is *470 applicable for 1975. 6. Whether the addition to tax pursuant to section 6653 for negligence or intentional disregard of rules and regulations is applicable for 1973 or 1975. FINDINGS OF FACT Some of the facts have been stipulated by the parties and are found accordingly. At the time they filed their petitions, Raymond J. and Jean R. Beran ("petitioners"), were residents of Grand Island, Nebraska. Raymond Beran ("Raymond") is a business consultant. His background includes a business degree and correspondence courses in accounting, several years of employment as an accountant for various companies, employment in the computer service industry (during which time he prepared simple tax returns), and three years as president and owner of a number of banks. Jean Beran ("Jean") is a housewife. Sale of Belfield Stock
On September 5, 1972, and August 23, 1973, Raymond acquired stock of the First National Bank of Belfield ("Belfield"), located in Belfield, North Dakota. Subsequently, Raymond sold the Belfield shares in two transactions, one occurring in late 1973, the other in 1975. In 1973 and 1975 Raymond realized gain from the sale of the Belfield stock, as follows: *471 1973
169 2/3 shares
104 1/3 shares
purchased
purchased
9/5/72
8/23/73
Sale price
$305,400
$187,800
Cost of shares sold
169 2/3 shares
99,300
104 1/3 shares
186,166
Gain realized
$206,100
$ 1,634
50% to Raymond [3]
$103,050
$ 817
1975
Sale price
$349,000.00
Cost of 172 shares sold
306,906.00
Gain realized
$ 42,094.00
50% to Raymond
$ 21,047.00
Sale of Crofton Stock
In January 1972 Raymond purchased a controlling interest in the Crofton State Bank ("Crofton") located in Crofton, Nebraska. A single stock certificate for 36,050 shares represented virtually all of Raymond's ownership in the bank. In March 1975 Raymond contracted to sell all of his Crofton stock for $8.50 per share to two individuals. The two sales agreements provided a closing date of July 1, 1975. The agreements further provided that their terms would be binding on the parties, their personal representatives, successors and assigns. During 1975 the Securities and Exchange Commission ("SEC") conducted an investigation into Raymond's activities as an officer *472 and director of the First National Bank of Belfield. [4] In order to prevent any potential government interference with his interest in Crofton or the pending sale of that interest, Raymond transferred the certificate representing 36,050 shares of Crofton stock to his wife's name. Raymond unilaterally decided to transfer these shares to Jean and he told her of the transfer only after it had been completed. Neither Raymond nor his wife intended the transfer to constitute a sale and Raymond received no consideration in exchange for the transfer. Raymond also expected his wife to comply with the March sales agreements. On April 3, 1975, Raymond substituted the new certificate issued in Jean's name as collateral for a loan from Toy National Bank which had previously been secured by the certificate in Raymond's name. Between April 3 and July 1, 1975, Jean exercised no ownership rights in the stock. On July 1, 1975, Jean transferred the 36,050 shares pursuant to the March sales agreements. The purchasers of the stock considered Raymond to be the seller *473 of these shares and they followed Raymond's instructions regarding the application of the proceeds. [5] Jean received none of the sales proceeds. Automated Systems, Inc.
In 1970 Raymond wanted to increase an existing loan he had from the American Savings Company ("American"), located in Omaha, Nebraska. Because of Nebraska's usury laws, the bank was unwilling to advance additional funds to Raymond. The bank, however, suggested that a shell corporation could be used to avoid the undesirable aspect of the usury laws. The usury law in question did not apply to corporations. At this time Raymond owned Automated Systems, Inc. ("Automated"), a computer service corporation whose assets had been sold by Raymond in 1967. On July 8, 1970, American offered to lend Automated $22,000, provided that Raymond guaranteed the loan. [6] The proceeds of the loan were made payable to Automated and Automated in turn lent the money to Raymond. Raymond and Jean pledged their personal property as security for the loan. [7] Both the bank records and the bank correspondence relating *474 to the loan referred to Automated as the borrower. On at least two occasions American and Automated modified the terms of the original loan. On both of these occasions Raymond approved those changes in his capacity as president of Automated. In connection with the loan to Automated, life and disability insurance was maintained on Raymond, with American named as the primary creditor beneficiary and Automated as the secondary beneficiary. *475 Raymond personally paid the principal and interest on the Automated loan. Raymond deducted the $2,523.55 interest payments on his and his wife's 1973 joint return. 1975 Joint Return
In 1975 petitioners failed to file a joint or separate return within the time prescribed by section 6072(a), as extended. Pursuant to section 6020(b), the Internal Revenue Service prepared separate substitute returns for Raymond Beran and Jean Beran. Separate notices of deficiency for 1975 were issued to Raymond and Jean on December 13, 1977.These notices computed each of their income tax liabilities using the married-filing-separate tables. Subsequent to the mailing of the notices of deficiency for 1975, petitioners mailed the Internal Revenue Service a joint return prepared by a certified public accountant which was received by the Service on February 15, 1978. Raymond and Jean filed separate petitions with respect to 1975 on March 13, 1978. Failure to File
The SEC conducted an investigation into the affairs of a partnership entitled Beran, Kaminski and Associates, of which Raymond was a partner. In 1975 the partnership records were held by various parties involved in the SEC *476 investigation. [8] Petitioners claim they are entitled to partnership losses for 1975 but did not include any such losses on the joint return for 1975 filed in February 1978. By October 15, 1976, petitioners possessed all the information contained in the 1975 joint return. [9]
In his statutory notice for 1973, respondent determined that petitioners had incorrectly computed gain on the sale of the Belfield stock in that they did not use the first-in, first-out ("FIFO") method in allocating their basis. Respondent also disallowed the $2,523.55 interest deduction relating to the Automated loan. Respondent's statutory notices for 1975 are based on the substitute returns authorized by section 6020. With respect to Raymond Beran's substitute return, respondent determined that the gain on the sale of the Belfield stock should be computed using the FIFO method of basis allocation. With respect to Jean Beran's substitute return, respondent determined *477 that she had unreported short-term capital gain of $105,987 resulting from the sale of the Crofton stock. In his amended answer, respondent alternatively determined an increase in Raymond's 1975 deficiency resulting from the unreported sale of the Crofton stock. In addition to the above deficiencies, respondent determined that additions to the tax for failure to file returns are applicable to 1975, and that additions to the tax for negligence or intentional disregard of rules and regulations are applicable in each of the three dockets. OPINION Sale of Belfield Stock
The first issue is the correct computation of the gain on the sale of First National Bank of Belfield ("Belfield") stock by petitioner, Raymond Beran ("Raymond") in 1973 and 1975. Raymond contends that he can adequately identify which shares of Belfield stock were sold in 1973 and 1975 and, accordingly, the actual basis of the identified shares should be used in computing his gain on those sales. Respondent, on the other hand, argues that the record contains no evidence identifying which shares were sold in 1973 and in 1975, and therefore Raymond must use the first-in, first-out ("FIFO") method in allocating *478 his basis. Section 1001(a) provides that the gain from the sale or other disposition of property is the amount realized less the adjusted basis of the property. Sections 1011 and 1012, insofar as here pertinent, provide that the basis of property sold is its cost to the taxpayer. When a taxpayer has acquired stock of a corporation on different dates or at different costs and sells only a part of that stock, a problem arises identifying the cost or basis of the stock which was sold. Section 1.1012-1(c), Income Tax Regs., sets forth the rules governing the bases of stock sold by a taxpayer who has acquired blocks of stock on different dates or at different costs. Subparagraph (1) [10] provides that the FIFO rule shall govern unless the lot from which stock is sold can be adequately identified. In other words, absent adequate identification of the lot from which the stock was sold, the basis of the stock sold shall be the basis of the first stock of that company acquired *479 by the taxpayer.The burden is on the taxpayer adequately to identify the stock which is sold. Rule 142(a), Tax Court Rules of Practice and Procedure. For the reasons stated below, Raymond has failed to meet his burden. *480 At trial, the parties indicated to the Court that grounds for settlement had been reached on this issue. Both parties agreed that they could use the stock certificates to trace which shares were actually sold in 1973 and which were sold in 1975. At the parties' request, the Court agreed to leave the record open for purposes of filing a supplemental stipulation which would indicate the result of tracing the stock certificates. The parties offered no evidence at trial on this issue because of the apparent settlement. After the trial, the parties met several times to work out a stipulation but, unfortunately, these attempts failed to produce any agreement. On June 8, 1979, the parties conferred with the trial judge whereupon it was agreed that the gain on the Belfield stock would be computed on the basis of the record as submitted. The parties were invited to submit computations based on the record. Neither party requested the Court to reopen the record on this issue.Because petitioner presented no admissible evidence to meet his burden of proof, [11] we sustain respondent's determination. Rule 142(a), Tax Court Rules of Practice and Procedure.
*481 Raymond misreads section 1.1012-1(c), Income Tax Regs. According to Raymond, a numerical matching of the number of shares bought and the number sold is adequate identification to prevent the use of the FIFO method. For example, assume that P purchases 18 shares in 1970 (represented by a number of stock certificates) and 24 shares in 1971 (also represented by a number of stock certificates) and P subsequently decides to sell 24 shares in 1975 and the remaining 18 shares in 1976. Raymond's position is that P's basis in the stock purchased in 1971 should be used to compute the gain derived from the 1975 sale regardless of which certificates were actually delivered to the purchaser. The problem with Raymond's argument, however, is that it ignores the mandate of section 1.1012-1(c)(2), Income Tax Regs., which provides that adequate identification depends on the identity of the certificates delivered and not solely on the number of shares delivered. Cf. Kluger Associates, Inc. v. Commissioner,69 T.C. 925, 936-938 (1978), on appeal (2d Cir., Jan. 8, 1979) ("[Under] section 1.1012-1(c)(2), Income Tax Regs. *482 , delivery of the proper certificate is a crucial element of an adequate identification.") At no time did Raymond provide or seek to provide the Court with the necessary information regarding the certificates transferred. Accordingly, the FIFO method is mandated by the Regulations, and respondent is sustained on this issue. Sale of Crofton Stock
The second issue is whether petitioner, Jean Beran ("Jean") is taxable on the 1975 sale of Crofton State Bank ("Crofton") stock. Respondent contends that the sale of 36,050 shares of Crofton stock should be attributed to Jean because in April 1975 her husband transferred these shares to her without restriction. In other words, respondent wants to tax the legal titleholder of the shares. On the other hand, Jean contends that she was a mere nominee and, consequently, she should not be considered the owner of the Crofton stock for income tax purposes, and we agree. The issue of who is the owner of property for income tax purposes is a question of fact which must be determined upon an examination of all the facts and circumstances.See Schoenberg v. Commissioner,302 F. 2d 416 (8th Cir. 1962), *483 affg. a Memorandum Opinion of this Court; Snyder v. Commissioner,66 T.C. 785 (1976). Upon a review of all the facts and circumstances in this case, we are convinced that Jean held the Crofton stock as a mere nominee for Raymond, her husband, who was the real owner of the stock. A brief recital of the facts supports this conclusion. Prior to the transfer of title to his wife in April 1975, Raymond used the stock as collateral for a loan from Toy National Bank and had contracted for the future sale of the 36,050 shares.In April 1975 Raymond was the target of an investigation by the Securities and Exchange Commission ("SEC"). To avoid potential government interference with his ownership of the stock and its pending sale, Raymond unilaterially decided to transfer the 36,050 shares of stock into his wife's name. Raymond neither expected nor received any consideration for this transfer. Subsequent to the transfer, Raymond used the new shares issued in his wife's name to replace his old shares as collateral for the Roy National Bank loan. In July 1975 Jean's shares were used to consummate the sales previously arranged by her husband. The proceeds of the sales were *484 distributed in accordance with Raymond's instructions and none of the proceeds were paid to Jean. Jean exercised no ownership rights during the short time she held title to the stock. In sum, Jean obtained only bare title to the 36,050 shares while the beneficial ownership remained with Raymond. In the alternative, respondent contends that the sale of the Crofton stock is attributable to Raymond and that the resulting gain should be included on his 1975 tax return. Because respondent raised this issue for the first time in his amended answer, he bears the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure. We believe the record leaves no doubt that Raymond was the owner of the Crofton stock at the time of the sale and, accordingly, respondent has sustained his burden of proof. The same facts recited above which lead us to conclude that Jean was not the beneficial owner of the Crofton stock, lead us to conclude that Raymond was the beneficial owner of that stock. [12] Therefore, the gain from the sale of the Crofton stock is includible in Raymond's 1975 income. *485 Automated Systems, Inc.
The third issue is whether petitioners are entitled to an interest deduction in 1973 for amounts paid on a loan obtained by Automated Systems, Inc. ("Automated"). Raymond contends that Automated is a mere nominee and should be disregarded for tax purposes. Respondent asserts that Automated should be recognized as a separate taxable entity. As a general rule, a corporate entity will not be ignored except in unusual circumstances. Britt v. United States,431 F. 2d 227, 233 (5th Cir. 1970). The principal exceptions in tax cases are when the corporation is a sham and when the corporation has been created for purposes of tax avoidance. Id. This doctrine was enunciated in the leading case of Moline Properties v. Commissioner,319 U.S. 436, 438-439 (1943), in which the Supreme Court prescribed the following criteria for recognition or nonrecognition of a corporate entity: The doctrine of corporate entity fills a useful purpose *486 in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. [Footnotes omitted.] This Court has previously held that the avoidance of restrictions under state law constitutes a valid business purpose under the Moline test. See Bolger v. Commissioner, 59 T.C. 760, 766 (1973). In this case, Raymond, who needed the money, was unable to borrow additional funds in his individual capacity due to Nebraska's usury laws. Since the particular usury laws were not applicable to corporations, Raymond used his wholly-owned shell corporation, Automated, to obtain the additional funds. This business purpose, the circumvention of the state's usury laws, is sufficient to require us to recognize Automated as a separate taxable entity.See Collins v. United States, 514 F. 2d 1282 (5th Cir. 1975), *487 affg. 386 F. Supp. 17 (S.D. Ga. 1974); Strong v. Commissioner, 66 T.C. 12, 24 (1976), affd. 553 F. 2d 94 (2d Cir. 1977). Moreover, the facts support the legal conclusion that Automated was a separate, recognizable entity. The correspondence relating to the loan was addressed to Automated, all the bank's documents refer to Automated as the borrower, the documents pertaining to the loan were signed by Raymond in his capacity as president of Automated, and the proceeds of the loan were payable to Automated. However, analysis does not stop there. In this case Automated did not need the money for its own use. It was a mere shell with no business activity. In fact Raymond, and not Automated, needed the money and would have borrowed it directly if he could have. Instead he had Automated borrow the money and lend it to him. Automated acted as a conduit, and to the extent we honor the reality of its loan from American Savings Company ("American") we must likewise give tax effect to the fact that Automated immediately reloaned the money on the same terms to Raymond. Respondent does not contend that this reloan should be treated as other *488 than a loan for tax purposes and we conclude that it should be so treated. Hence when Raymond directly paid American, in legal effect by discharging Automated's principal and interest liability to American, Raymond thereby satisfied and discharged his own corresponding liabilities to Automated. The reloan was apparently at the same interest rate which Automated paid American because Automated had no other source of funds with which to pay American. Whether petitioner is viewed as paying interest to Automated or directly to American, as Automated's agent, he is still entitled to the same interest deduction. 1975 Joint Return
The fourth issue is whether petitioners are entitled to file a joint return for 1975. Respondent prepared separate substitute returns pursuant to section 6020(b) for petitioners' 1975 tax year. Notices of deficiency were mailed on December 13, 1977, with respect to both of these substitute returns. On February 15, 1978, petitioners filed a joint return for 1975. Section 6013(b)(1) provides generally that a husband and wife who have filed separate returns *489 may subsequently elect to file a joint return. Section 6013(b)(2)(C) states, however, that such election may not be made "after there has been mailed to either spouse, with respect to such taxable year, a notice of deficiency under section 6212, if the spouse, as to such notice, files a petition with the Tax Court within the time prescribed in section 6213." Petitioners contend that the language of section 6013(b)(2)(C) permits them to file a joint return at any time prior to the filing of their petitions (which were filed on March 13, 1978). [14] We must, however, disagree with petitioners' interpretation. This same issue was recently before the Court in Jacobson v. Commissioner, 73 T.C. 610, 614 (1979), wherein we stated: * * * At first blush, it may appear strange that the statute would cut off a taxpayer's switching privilege at the 90-day letter stage if he goes the Tax Court route but only at the litigation *490 stage if he pays the tax and seeks a refund. However, the words of the statute clearly so provide. Had Congress intended to allow a Tax Court petitioner to switch until he files his petition, language to such effect would have been simpler to write than the provisions of section 6013(b)(2)(C). Congress may have been concerned with the potential procedural tangle which would have been created had a taxpayer in this Court been able to change his position so fundamentally after a notice of deficiency had issued. In the refund situation, a refund claim must be filed before commencing suit, section 7422(a), and there can be no material variation between the claim and complaint. Old Dominion Box Company, Inc. v. United States, 477 F. 2d 340, 346-347 (4th Cir. 1973), cert. denied 414 U.S. 910 (1973). Hence the procedural situations are dissimilar.All this, of course, is mere speculation. We must take the statute as we find it. And as written the only question is whether petitioner and her husband filed the amended joint return on or before the date the notice *491 of deficiency was mailed to petitioner. Accordingly, petitioners are precluded by section 6013(b)(2)(C) from electing to file a joint return for 1975. [15]
The final issues for decision relate to the applicability of various additions to the tax. Section 6651(a)
*492 Section 6651(a) provides that an addition to the tax shall be imposed in the case of failure to file a return, unless it is shown that such failure is due to reasonable cause and not due to willful neglect. If a taxpayer exercises ordinary business care and prudence and is nevertheless unable to file a return within the prescribed time, then the delay is due to a reasonable cause. Sec. 301.6651-1(c)(1), Proced. & Admin. Regs.Petitioner bears the burden of proof on this issue. Fischer v. Commissioner, 50 T.C. 164, 177 (1968). The question presented is whether Raymond's failure to file a return in 1975 was due to reasonable cause. [16] Raymond contends that his failure to file a return for 1975 stems from an investigation by the SEC into the affairs of a partnership, Beran & Kaminski, Associates, in which he was a partner. Believing the partnership incurred considerable losses in 1975, Raymond wanted to incorporate his allocable share of those losses into his 1975 return. However, he was allegedly unable to obtain any partnership information because the partnership records were held by various parties involved in the SEC investigation. These parties included not *493 only the SEC itself, but also an attorny who acted as a receiver for the partnership's assets and the partnership's accountant. According to Raymond, the partnership records were still unavailable in February 1978 when he submitted his 1975 joint return. On the basis of the record presented, we conclude that Raymond's failure to file was not due to reasonable cause. Initially, Raymond presented no evidence as to how he knew that the partnership's 1975 losses were substantial. We have no way of ascertaining whether such losses were actually incurred or te magnitude of those losses; nor do we have any basis for saying that Raymond's belief that he was entitled to large partnership losses was well-founded. Raymond did not show that he had a working knowledge of the partnership's books and records, nor did he obtain an opinion regarding the partnership's 1975 operations from the partnership's counsel or accountant. Second, although Raymond stated that his attempts to secure partnership information were unsuccessful, he did not indicate why the information *494 was unavailable. We do not know the extent of Raymond's efforts to secure the information or the nature of the responses to his inquiries. All we know is that Raymond allegedly telephoned the SEC, the attorney acting as the partnership's receiver, and the partnership's accountant, to request the information. Without knowing the details of those alleged conversations, we cannot say that petitioner exercised ordinary business care and prudence in attempting to file a timely return. See Blum v. Commissioner, 5 T.C. 702, 712 (1945). Finally, we have no way of determining if Raymond's continued failure to file after the extension period of October 15, 1976, was due to the SEC investigation. Raymond offered no evidence as to the length of the SEC investigation or whether the records were inaccessible during the entire course of the investigation. Clearly, it is unreasonable to assume that records which are inaccessible for one year will remain inaccessible thereafter. Yet, Raymond provided us with no information regarding the continuity of his efforts to secure the necessary information. Section 6653(a)
*495 Section 6653(a) provides for an addition to tax of five percent of the "underpayment" where any part of such underpayment is due to negligence or intentional disregard of rules and regulations. We have held that the negligence penalty may be assessed in addition to the failure to file penalty, Robinson's Dairy, Inc. v. Commissioner, 35 T.C. 601, 609 (1961), affd. 302 F. 2d 42 (10th Cir. 1962), provided it has not been established that respondent relied solely on the circumstances of unaggravated late filing without reasonable cause to apply the negligence penalty. See Estate of Haseltine v. Commissioner, 35 TCM 1242, 1245, 45 P-H Memo. T.C. par. 76,278 (1976). The burden of proof again rests on petitioners, Bixby v. Commissioner,58 T.C. 757, 791 (1972). With respect to the 1973 penalty, petitioners seek to shed their burden of proof on the grounds that respondent did not specify the acts or omissions on which he based his determination. Petitioners cite Kilborn v. Commissioner, 29 T.C. 102 (1957), modified on other issues in an unreported opinion (5th Cir., Sept. 18, 1958), 2 A.F.T.R. 2d 5812, 58-2U.S.T.C. par. 9847, *496 in support of their argument. In Kilborn the case was decided against respondent after petitioner had introduced evidence rebutting the negligence determination. At trial and on brief respondent had pointed to no evidence of negligence. Respondent, contrary to petitioners' argument, is not required to specify the negligent acts in the statutory notice. Marcello v. Commissioner, 380 F. 2d 499 (5th Cir. 1967). Here petitioners disregarded respondent's regulations (section 1.1012-1(c)(2)) in computing their gain on the Belfield stock in both 1973 and 1975. Consequently, respondent's determinations of the negligence penalty are sustained for 1973 and 1975. [17]
To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Raymond J. Beran, docket no. 2582-78 and Jean R. Beran, docket no. 2616-78.↩
1a. Mr. Clare withdrew as counsel of record on November 29, 1979.↩
2. All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩
3. Raymond owned only a 50 percent interest in the Belfield stock.↩
4. This investigation eventually led to an indictment and conviction under 18 U.S.C. § 656 (1970)↩.
5. Some of the proceeds were received directly by Raymond while the remainder were paid to Raymond's creditors.↩
6. The guarantee signed by Raymond read as follows: The Undersigned, jointly and severally, guarantee to the holder of the within note, the payment, promptly when due, of every installment thereunder, and the payment upon demand, of the entire amount owing thereon upon any default thereunder by the Maker without requiring any proceeding against the Maker. The Undersigned waive notice of acceptance hereof and of any default by Maker. The holder may, without notice to or consent of the Undersigned, enforce any rights thereunder, grant extensions of time of payment, and compromise or adjust any claims against Maker without affecting the liability of the Undersigned. ↩
7. The loan was also secured by a first lien on a 160-acre farm owned by Jean's mother.↩
8. Besides the SEC, the attorney acting as the partnership's receiver and the partnership's accountant also held some of the partnership records. ↩
9. Raymond's final extension of time to file for 1975 expired on October 15, 1976.↩
10. Section 1.1012-1(c) provides: (c) Sale of stock. (1) In general. If shares of stock in a corporation are sold or transferred by a taxpayer who purchased or acquired lots of stock on different dates or at different prices, and the lot from which the stock was sold or transferred cannot be adequately identified, the stock sold or transferred shall be charged against the earliest of such lots purchased or acquired in order to determine the cost or other basis of such stock and in order to determine the holding period of such stock for purposes of subchapter P, chapter 1 of the Code. If, on the other hand, the lot from which the stock is sold or transferred can be adequately identified, the rule stated in the preceding sentence is not applicable. As to what constitutes "adequate identification", see subparagraphs (2), (3), and (4) of this paragraph. (2) Identification of stock. An adequate identification is made if it is shown that certificates representing shares of stock from a lot which was purchased or acquired on a certain date or for a certain price were delivered to the taxpayer's transferee. Except as otherwise provided in subparagraphs (3) or (4) of this paragraph, such stock certificates delivered to the transferee constitute the stock sold or transferred by the taxpayer, * * *↩
11. In accordance with the Court's invitation, Raymond submitted his own computation of the gain on the sale of the Belfield stock. This computation reflected the amounts previously reported on his 1973 return. Raymond attached to the computation certain exhibits, the Significance of which he explained in his brief. Neither the attached exhibits nor certain items reflected in the computation have been offered or admitted as evidence. These items are not part of the record in this case and, accordingly, we may not consider them in our determination. See Rule 143(b), Tax Court Rules of Practice and Procedure; Wisconsin Butter & Cheese Co. v. Commissioner,10 B.T.A. 852, 854↩ (1928).
12. It is significant that the 1975 joint return, submitted by petitioners after the issduance of the notices of deficiency, reported the gain from the sale of the Crofton stock.↩
14. Petitioners correctly concede that the substitute returns filed pursuant to section 6020(b) qualify as separate returns for purposes of section 6013(b)(2). See Conovitz v. Commissioner, T.C. Memo. 1980-22↩ (January 23, 1980).
15. We reject petitioners' contention that our interpretation of section 6013(b)(2)(C) is unconstitutional under the due process clause of the Fifth Amendment in that it requires taxpayers to abstain from petitioning the Tax Court if they wish to file a joint return. Initially, we note that section 6013(b)(2)(C) does not condition the election to file a joint return on abstaining from filing a petition in this Court, but rather it only sets a time limit on such election. Second, the mailing of the notice of deficiency is a reasonable cut-off in light of the potential procedural tangle that a later date might entail. See Jacobson v. Commissioner, supra; Conovitz v. Commissioner, supra↩.Third, petitioners have no constitutional right to have their case tried in the Tax Court.
16. Because we hold that Jean was not taxable on the sale of the Crofton stock, she was not required to file a return in 1975.↩
17. Because we hold that Jean was not taxable on the sale of the Crofton stock, the 1975 negligence penalty is not applicable to her.↩