KLUGER ASSOCIATES, INC., Appellant,

v.

COMMISSIONER OF INTERNAL
REVENUE, Appellee.

KLUGER, INC., Appellant,

v.

COMMISSIONER OF INTERNAL
REVENUE, Appellee.

David and Bertha KLUGER, Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE, Appellee.

No. 919, Docket 79–4013.

United States Court of Appeals,
Second Circuit.

Argued May 18, 1979.

Decided March 17, 1980.

Marvin A. Chirelstein, New Haven, Conn., and Starr, Weinberg & Fradkin, Newark, N. J., for appellants.

M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Gary P. Allen, Carleton D. Powell, Attys., Tax Division, Dept. of Justice, Washington, D. C., for appellee.

Before WATERMAN and MESKILL, Circuit Judges, and WYATT, District Judge.*

WYATT, District Judge:

This is a joint appeal by related taxpayers (two corporations (who filed separate returns) and a husband and wife (who filed joint returns)) from three decisions of the United States Tax Court, each entered on October 13, 1978, and each based on the same opinion of the Tax Court (by Honorable Irene F. Scott, Judge), but each affecting different taxpayers. The opinion of the Tax Court is reported in 69 T.C. 925 (1978). The jurisdiction of this Court derives from 26 U.S.C. § 7482(a).

Appellants are David and Bertha Kluger, husband and wife, whose legal residence at all relevant times has been New York, New York; Kluger Associates, Inc. ("Associates"), a New Jersey corporation, whose principal place of business at all relevant times has been New York, New York; and Kluger, Inc. ("Inc."), a New Jersey corporation, whose principal place of business at all relevant times has been New York, New York. Associates and Inc. are personal holding companies as defined in 26 U.S.C. § 542(a). The venue in this Court is proper under 26 U.S.C. § 7482(b)(1). For some reason not made to appear, the taxpayers filed their returns, on which appellee (the "Commissioner") assessed deficiencies, with the district director of the internal revenue district for New Jersey rather than for New York, as would seem to have been the proper place for filing (26 U.S.C. § 6091, 26 C.F.R. § 31.6091–1). For the Klugers and for Inc. the years involved are 1967 and 1968; for Associates, the years involved are 1966, 1967 and 1968.

The principal issue is the adequacy of identification of shares of stock sold by the taxpayers, this affecting the cost of such shares in computing capital gains. The Commissioner determined that the identification was inadequate and, relying on a Regulation appearing at 26 C.F.R. § 1.1012–1(c)(1), applied the first in-first out method in calculating the cost of the shares sold. This lowered the cost of the shares sold, increased the capital gains, and resulted in the deficiencies assessed.

The second issue is whether, assuming that the identification of shares sold was inadequate and that the increase in capital gains was correct, the Commissioner was also correct in increasing the personal holding company taxes of Associates and Inc.

For the reasons hereafter given, we affirm the decisions of the Tax Court.

1.

The taxpayers at all relevant times were in the business of buying and selling shares

---

* Honorable Inzer B. Wyatt, United States District Judge for the Southern District of New York, sitting by designation.

of stock in great volume for their own account. The shares were listed on an exchange, and the taxpayers bought and sold through brokers.

Shares of stock are represented by certificates, which are numbered for identification. Stock certificates are generally for 100 shares, but often there are certificates representing much larger numbers of shares.

The certificates for the shares were kept by taxpayers in their own custody, not in the custody of their brokers. The taxpayers had a suite of offices in New York City, and David Kluger directed their affairs. The stock certificates were kept in vaults in a bank near the offices.

There were many separate purchases of the same stock in the same company, each at a different time and for a different price. We are told that there were sometimes as many as forty different lots of the same stock. It would have been possible to identify the different lots by certificate numbers.

Many shares were acquired, not by purchase but by some form of capital change. There were stock splits and stock dividends. There were mergers of one company into another; at times a taxpayer owned shares of both companies. When there were mergers, new certificates for shares were issued. On stock splits, stock dividends, and mergers, large denomination (much larger than 100 shares) certificates were frequently issued. The taxpayers often exchanged smaller denomination certificates for a fewer number of large denomination certificates. Sometimes, on sale of part but not all of the shares owned in a given company (this being the usual sale), a large denomination certificate would be delivered and "change" received in the form of smaller denomination certificates.

The taxpayers maintained separate books of account which seem to have been accepted as accurately kept. A separate ledger sheet was kept for each corporation the stock of which was owned. Purchases of the stock were recorded on the top half of the ledger sheet, sales on the bottom half.

On purchases, record was made of the date of purchase, number of shares and cost price per share. Sometimes record was made of the certificate numbers representing the shares purchased. The Tax Court found (69 T.C. at 928): "In many instances, however, the ledger sheets reflect no certificate numbers for the various blocks of stock purchased." Shares received on stock splits, stock dividends, and mergers were reflected on the ledger sheets but certificate numbers for these shares were not recorded.

Sales of stock for all the taxpayers were made by David Kluger by telephone instructions to the broker. In all instances here involved the number of shares sold were fewer than the shares owned. Having given the sale instructions, Mr. Kluger then selected the lot or lots from which the shares were to be sold. The selection was noted in writing by date of purchase and the cost price; naturally, the highest cost shares available were selected. The written document showing the selection was given to the bookkeeper. When confirmation of the sale was received from the broker, the number of shares, sale date, sale price and gain or loss were entered on the lower half of the ledger sheet.

In an attempt to identify on the books of the taxpayers the lots from which the shares were sold, a "key" number was placed on the stock ledger sheet next to the information concerning the sale. The key number was the number of the sale transaction in that particular stock, "1" for the first, "2" for the second, and so on. The same key number was placed next to the entries on the ledger sheet concerning the purchase lot or lots which Mr. Kluger had selected as the shares from which the sale was to be made.

Stock certificates had to be physically delivered to the broker to complete the sale. It appears to have been the uniform practice for Mr. Kluger himself to go to the bank vault, secure the certificates needed, and deliver them to the broker. If there were certificate numbers shown on the ledger sheet for the shares to be delivered,

the bookkeeper furnished Mr. Kluger with a list of these numbers. If no certificate numbers were so shown, then, as the Tax Court found, "the bookkeeper had no way of knowing which certificates corresponded to that particular keyed sales transaction and could not, therefore, list any certificate numbers to furnish to Mr. Kluger" (69 T.C. at 930).

The Tax Court found that, where certificate numbers were shown on the ledger sheets and where, therefore, it was an easy matter to deliver the specific identified certificates in completion of the sale, nevertheless "as a general rule" Mr. Kluger "did not deliver the certificates whose numbers corresponded to the certificates shown by the . . . ledger sheets as having been sold . . . ." (69 T.C. at 931, 933). The Tax Court concluded that the taxpayers "were primarily concerned with delivering the proper number of certificates and not with delivering the specific certificates representing the shares 'keyed off' " (69 T.C. at 937).

### 2.

The cost of shares sold is the basis for determining the capital gain or loss on the sale. 26 U.S.C. §§ 1011, 1012, 1016.

Where all the shares of a corporation owned by a taxpayer are sold at one time, normally it is not difficult to determine their cost. Where, however, the shares were acquired at different times and at different costs (either different purchase prices or different attributed costs, as on mergers, etc.) and fewer than all owned shares are sold, then there may well be a problem to determine the cost of the shares sold. It may be useful to relate in chronological order the more significant developments in the administrative and judicial treatment of this problem.

The earliest regulations, adopted in 1918, dealt with shares sold from lots bought at different times and prices where "the identity of the lots can not be determined". In such a case, it was provided that "the stock sold shall be charged against the earliest purchases of such stock" (Regulations No. 33 (revised), Art. 4, para. 60). This is the "first in-first out", or FIFO, principle.

In April 1935 the Supreme Court decided *Helvering v. Rankin*, 295 U.S. 123, 55 S.Ct. 732, 79 L.Ed. 1343. Turner, the taxpayer, inherited bonds, sold the bonds, opened a margin account with a broker, bought 1200 UGI shares, received 300 UGI shares as a stock dividend, sold 300 UGI shares, bought 1,000 UGI shares, sold 500 UGI shares, and finally sold 500 UGI shares. Turner was left with 1200 UGI shares. Turner never held any share certificates; they were held by his broker and were always in street names; the sales and purchases were recorded only by debits and credits to Turner's account on the books of the broker. It was thus impossible to identify by certificate numbers what shares were delivered against the sales and what 1200 shares remained. For such cases, the Supreme Court laid down an important rule favoring taxpayer. Speaking for the Court, Mr. Justice Brandeis declared (295 U.S. at 128–29, 55 S.Ct. at 734):

The Commissioner contends that Turner's communication to his broker of his intention to keep 1,200 [UGI] shares . . . was ineffective to identify the shares to be sold, because, from the very nature of these marginal operations, the shares were incapable of identification by the broker or anyone else. The basis for this contention is the facts that in such transactions no certificate is issued in the name of the customer, or earmarked for or otherwise allocated to him; that all certificates are in the name of the broker or street names; and that all certificates for stock of the same kind are commingled and held by the broker for the common benefit of all dealing in that particular stock. The fallacy of this argument lies in the assumption that shares of stock can be identified only through stock certificates. It is true that certificates provide the ordinary means of identification. But it is not true that they are the only possible means. . . . Particularly is this so when, as here, the thing to be established is the allocation of lots sold to lots purchased at different dates and dif-

ferent prices. The required identification is satisfied if the margin trader has, through his broker, designated the securities to be sold as those purchased on a particular date and at a particular price. It is only when such a designation was not made at the time of the sale, or is not shown, that the "First-in, first-out" rule is to be applied.

Under the *Rankin* decision, where the certificates are held by the broker, a designation at the time of sale by the taxpayer, by date and price of purchase, of the shares to be sold, is a sufficient identification; it is not essential to identify by the certificate numbers of the shares actually delivered.

Then, later in the same year, came a decision by this Court (L. Hand, Swan, A. N. Hand) in *Miller v. C.I.R.*, 80 F.2d 219. Miller bought and sold stock through a broker, but many of the separate purchases could be identified by the numbers of certificates held by the broker. Miller sold 200 Otis shares and instructed the broker to deliver 200 shares bought December 28, 1926. These could be identified by certificate number, but by mistake the broker delivered certificates for 200 shares bought April 17, 1924. The Commissioner argued that the cost of the shares bought April 17, 1924, must be used because the certificates actually delivered control, regardless of the taxpayer's instructions. Relying on *Helvering v. Rankin*, this Court rejected the argument and held: "a designation made at the time of sale sufficiently identifies the stock" (80 F.2d at 220). Judge Augustus Hand continued (80 F.2d at 221):

This view carries out the purpose of the taxpayer, and we cannot see that it is contrary to sound public policy. If he had ordered a sale of . . . shares of Otis Elevator stock without instructions as to dates of purchase, and after the sale had stated that he had intended to sell other shares than those evidenced by the certificates delivered, we should not regard his statement as a sufficient designation. But written instructions to sell embodying the number of shares and dates of purchase are an even more persuasive identification of the shares to be sold than the certificates which a broker may deliver without any thought about the particular lot he is selling. The identity of certificates frequently disappears in mergers, consolidations, or split-ups, and a single certificate may be issued in the place of various prior ones. A designation by the taxpayer of just the shares he is selling is often the best, if not the only available means he has for exercising his option to select the particular shares he desires to sell.

It follows from the foregoing: (1) That where there is no designation by the taxpayer at the time of making the sale, the certificate should be treated as the proper means for identification; (2) that a designation by instructions to the broker of the shares to be sold is controlling though the certificate delivered does not correspond with the instructions; (3) that the "First in First out" rule applies only where there is neither identification by a certificate, nor by designation of the taxpayer.

Under the *Miller* decision, where the certificates are held by the broker, a designation by the taxpayer, by date and price of purchase, of the shares to be sold, is a sufficient identification, regardless of the certificate numbers actually delivered by the broker.

The rule laid down in *Miller*, as just described, was not to last very long. It was rejected and overturned by *Davidson v. Commissioner*, 305 U.S. 44, 59 S.Ct. 43, 83 L.Ed. 31, an important and unanimous decision of the Supreme Court in 1938. The taxpayer bought in 1929 1000 shares of X stock at $50 per share. Before 1929 he had bought 1000 shares of X stock at a much lower price. The certificates were held by a bank as collateral for a loan. In 1929 the taxpayer instructed his broker to sell X shares bought at the high cost *in* 1929; he instructed the bank to deliver to the broker certificates for shares bought *in* 1929. By mistake the bank delivered to the broker certificates for shares bought *before* 1929. The taxpayer reported capital gain on the basis of the cost of X stock bought *in* 1929.

The Supreme Court ruled that the (before 1929) certificates actually delivered were the shares sold for capital gain determination. The Court said (305 U.S. at 46, 59 S.Ct. at 44):

> Undoubtedly, petitioner sufficiently indicated to the broker and to the bank the shares he intended to sell. . . . But it *does not follow* that they were the shares sold. . . . The commissioner rightly computed gain on the basis of what was done rather than on what petitioner intended to do.

After *Davidson*, wherever identification by certificate number was possible, it was essential that this be employed. The certificates actually delivered were controlling in the determination of cost regardless of the intent of the taxpayer and regardless of errors made by hired custodians of the certificates.

The *Davidson* rule became a very heavy burden on this last category—brokers, bankers, investment advisors and the like—as well as on taxpayers. The business of stock custodians was expanding and at the same time there was an "ever increasing avalanche of stock splits, stock dividends, mergers and recapitalizations . . . ". Colgan, *Identification of Securities Sold or Transferred*, 18 N.Y.U.Inst. of Fed. Tax 331 (1960).

In 1958 the Treasury adopted regulations, one of which relieved custodians and taxpayers of the burden of identification by certificate numbers of shares delivered. The regulation is 26 C.F.R. § 1.1012–1(c)(3)(i), applicable where stock is kept by a taxpayer in the custody of a broker or other agent. The regulation provides in substance that it is an adequate identification of shares sold if the taxpayer specifies the particular stock to be sold and if confirmation is set forth in a written document from the broker. Stock so identified is treated for cost purposes as the stock sold, even though the broker by error delivers certificates representing other shares. It will be seen that this regulation, where applicable, effectively nullifies the *Davidson* decision and reinstates the rule of this Court in *Miller*.

The regulation applies only where the certificates are in the custody of a broker or other agent. Where, as in the case at bar, the certificates were in the custody of the taxpayers themselves, then the rule of *Davidson* continues to apply and identification by certificate number is essential. The reasons for the distinction are understandable. Where the certificates are held by an outside custodian, the Treasury may reasonably rely on the normal business routine of such custodian plus the written confirmation by that custodian of the shares instructed to be sold. Where the shares are held in the custody of the taxpayer, there is not a satisfactory substitute on which reliance can be put; it is thus only reasonable to require identification by the taxpayer by certificate numbers, as laid down in *Davidson*.

In adopting the 1958 regulations, however, the Treasury recognized that in some situations it would not be possible for a taxpayer having custody of stock certificates to identify by certificate numbers, for example, in stock splits and mergers, where, as emphasized by appellants here (for example, Brief, pp. 22, 23), the "new certificates were issued in much larger denominations than any single, original lot." A regulation adopted in 1958 (now 26 C.F.R. § 1.1012–1(c)(3)(ii)) provided in substance that when one certificate represented shares from different lots and when the taxpayer sells part of the shares through a broker, it is an adequate identification if the taxpayer in delivering the certificate to the broker specifies the particular shares to be sold and if the broker confirms such specification in writing.

The 1958 regulations thus seem to have dealt fairly and reasonably with the problems inherent in the identification of shares of stock sold, whether the shares be held by an outside custodian or by the taxpayer himself. Indeed, a prominent member of the Tax Bar in New York wrote: "The Revenue Service and the Commissioner are to be complimented on the forward-looking attitude embodied in these regulations".

Colgan, above cited, at 334. Certainly the regulations are valid, as reasonable and as consistent with the revenue statutes. *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948).

3.

Such had been the regulations and such the decisional background for something over ten years when the controversy now at bar developed. The beginning was a field audit of the relevant returns, initiated in 1969 by an examining agent of the Internal Revenue Service. This audit was apparently more thorough than those in earlier years. Before the audit was concluded, the agent had obtained stock issuance records from the corporations, stock of which was sold by one of the taxpayers in the years in question. Comparison could thus be made between the shares identified by the books of the taxpayers as sold and the shares shown by the records of the corporations as delivered on the sales. Such a comparison, where the ledger sheets of the taxpayers showed certificate numbers, satisfied the agent that there was no correspondence, or very little correspondence, between the shares claimed by the taxpayers to have been sold and the shares actually delivered. The agent therefore rejected the identification as inadequate and, under 26 C.F.R. § 1.1012–1(c)(1), determined the cost of shares sold by the first in-first out principle.

Notices of deficiencies to the taxpayers (26 U.S.C. § 6212(a)), each dated April 17, 1974, followed.

The taxpayers then timely filed petitions in the Tax Court (26 U.S.C. § 6213(a)) for a redetermination of the deficiencies.

The trial before the Tax Court was in Newark, New Jersey on February 2 and 3, 1977. There was little dispute about the facts; most of the relevant facts were stipulated. There was much documentary evidence, including the records relied on for identification by the taxpayers and the records of the corporations the stock of which was sold by the taxpayers.

The opinion of the Tax Court was filed on March 16, 1978. The three decisions of the Tax Court were entered on October 13, 1978.

4.

The Tax Court itself carefully compared the shares claimed on the returns to have been sold with the share certificates shown by the records of the corporations as having been delivered on the sales. There were "hundreds of transactions" (69 T.C. at 961 fn. 5); we are told in the brief for appellants (p. 6) that the two corporate appellants had approximately 550 sale transactions in the relevant years. Where the records of the taxpayers showed the certificate numbers of the shares claimed to have been sold, an exact comparison could be made by certificate numbers. Whether the Tax Court made a comparison (for example, by dates and denominations of certificates) where the records of the taxpayers did not show certificate numbers for the shares sold, is not absolutely certain. The findings and opinion (69 T.C. at 931 fn. 5, 937, and 938) suggest that comparisons were made on *all* transactions. In any event, it was found by the Tax Court that in only sixteen instances had the proper certificates been delivered, that is, certificates were delivered which could be shown by certificate number to be shares acquired at the times and for the cost amounts shown on the tax return. The Tax Court concluded (69 T.C. at 937) that appellants "were primarily concerned with delivering the proper number of certificates and not with delivering the specific certificates representing the shares 'keyed off' ".

The Tax Court held that, since the taxpayers kept custody of their share certificates, regulation 26 C.F.R. § 1.1012–1(c)(2) was applicable; that under such regulation the certificates actually delivered on the sales had to be those certificates representing the shares claimed on the tax return to have been the shares sold; that, except in the sixteen instances mentioned above, it had been shown by the evidence that the certificates actually delivered by the taxpayers did not represent the shares claimed in the return to have been sold; and that

**330**

the first in-first out principle of regulation 26 C.F.R. § 1.1012–1(c)(1) had therefore to be applied. It is fairly to be inferred from the opinion that identification by certificate numbers would always be adequate and that the substitute methods employed by appellants were inadequate.

As to the sixteen exceptional instances, where the shares actually delivered could be shown by certificate numbers to be the shares acquired at the times and for the cost amounts shown in the tax return, for one of these the Commissioner had not determined any deficiency. For the other fifteen instances, the Commissioner, relying on the first in-first out principle, had determined deficiencies but the Tax Court eliminated these in its decision on the ground that there had been adequate identification of the shares claimed in the return to have been sold.

The Tax Court did not consider a point, now raised here by appellants (Brief, pp. 42, 47, 48) but not (according to the record before us) made by them in the Tax Court. This relates to shares delivered on a sale shown on the return where the shares can be identified by certificate numbers as having been acquired at a specific time for a specific cost amount but where the time and the amount are *not* those shown on the return. Such shares would belong to the category designated by appellants in this Court as "traceable" and appellants are correct in stating (Brief, p. 42) that under both the *Davidson* rule and regulation 16 C.F.R. § 1.1012–1(c)(2) the cost of *those* shares would control in determining capital gain and the first in-first out principle would not be applicable. But this point (according to the record) was not raised in the Tax Court; indeed, in the Tax Court the appellants did not distinguish between what they now call "traceable" and what they now call "untraceable" shares. In consequence, the Tax Court did not address the question and, except for the elimination of the deficiencies as to the fifteen instances explained above, sustained the position of the Commissioner in applying the first in-first out principle.

5.

The situation having been thus reviewed to an understanding of the present appeal, it will be quickly apparent that the Tax Court decisions must be affirmed.

The appellants did not comply with the regulations applicable since 1958, not said to be for any reason invalid. It would have been a fairly easy matter for appellants to have complied, even with the system of records adopted by them.

Wherever the records of the taxpayers showed the certificate numbers of the shares bought and which Mr. Kluger had decided were to be delivered on a sale, it would have been a simple matter to deliver those very certificates to complete the sale. The findings of the Tax Court are that this was not done nor even any effort made to do so.

In other situations—stock splits, stock dividends, mergers, for example—it would have been less easy to allocate and to trace by certificate number, but it could have been done. As Judge Learned Hand, in *Curtis v. Helvering*, 101 F.2d 40, 41 (2d Cir. 1939), said: " . . . splits, share dividends, and rights, would all have been easily traceable to the original shares out of which they came, and while it would have been somewhat difficult to allocate the original cost of a share among its progeny, there is nothing impossible in it; indeed, it is done every day in tax returns."

In this connection, it is emphasized for appellants (Brief, for example, pp. 7, 8, 22, 23) that they would hold a single large denomination certificate "attributable to all the prior purchases at once" (Brief, p. 23). The argument is that they could not trace any particular shares represented by this one certificate to an original purchase date. But the regulations contemplate and reasonably provide for just this situation. Where the taxpayer holds a single stock certificate representing stock from different lots, and wishes to sell fewer than all the shares, he may specify to his selling broker the particular shares to be sold, and this specification controls, provided the taxpayer secures a written confirmation of the

specification from the broker (26 C.F.R. § 1.1012–1(c)(3)(ii)). No attempt was made by appellants to comply with this regulation.

### 6.

Appellants, asking reversal of the Tax Court decisions in an able presentation, separate their argument into two parts: one part relates to what are called "traceable certificates" (Brief, pp. 13, 16, 17, 42–47); the other part relates to what are called "untraceable certificates". (Brief, pp. 13, 16, 17, 22–41).

"Traceable certificates" represent shares which can be traced by certificate numbers to particular purchase dates. (Brief, p. 13).

"Untraceable certificates" represent shares which cannot be traced by certificate numbers to particular purchase dates—usually because "received as stock dividends, or in stock splits, mergers, or other exchanges." (Brief, p. 13.)

### 7.

■ The argument as to "traceable certificates" is that, while "literally applicable" to them (Brief, p. 42), regulation 26 C.F.R. § 1.1012–1(c)(2) "ought not to be applied to them" because they are "professionals in the securities field who handle large quantities of stock certificates and who maintain books and records which systematically record their inventories." (Brief, pp. 42, 44.) This argument cannot be accepted. The cited regulation by its terms does apply to them because they did not place custody of their certificates with a broker or other agent. Thus, there was no *outside* professional custodian on whose business methods and on whose written confirmations the Treasury could rely.

■ A second argument for appellants is based on the possibility, to which we have already referred, that certificates delivered on a sale shown in the return may be capable of identification by certificate number but when so identified may be found not to be the shares claimed in the return to have been sold. Appellants contend (Brief, pp. 42, 47–48) that in such instances the cost of the shares actually delivered should be used

to determine capital gain rather than the cost arrived at from application of the first in-first out principle. This contention would normally be entirely correct, as we have already indicated. But in the case at bar it cannot affect the result. Appellants have not shown that there were any such instances disclosed by the evidence in the Tax Court. Moreover, if there were such instances, further investigation would be necessary. Since for purchase dates and cost amounts used in their tax returns, the appellants based their identification on their own record books and key numbers, any shares delivered in any given year and identified by certificate numbers may have already been shown as sold on a return in an earlier year or may be shown as sold by the records and key numbers for the same year. Finally, and of decisive significance, this was a contention which should have been made in the Tax Court, after development of the relevant facts there. The contention was not made in the Tax Court, so far as appears from the record, and we must therefore pass it by, under the direction in *Hormel v. Helvering*, 312 U.S. 552, 556, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941). *See also Cooper v. C.I.R.*, 542 F.2d 599, 601 (2d Cir. 1976). (We pass by, as well, the suggestion of error (Brief, p. 24 fn. 6) as to merger shares based on *Commissioner v. Von Gunten*, 76 F.2d 670 (6th Cir. 1935).)

### 8.

The argument as to "untraceable certificates" is that, it being impossible to identify them by certificate numbers, identification by key number designation in the books of taxpayers should be sufficient. Reliance is on such decisions as *Miller v. Commissioner*, 80 F.2d 219 (2d Cir. 1935), decided long before the present regulations were adopted in 1958.

As a preliminary matter, the premise of the argument may well be questioned. The certificates could have been allocated to shares originally purchased and could have been identified by certificate numbers, had the taxpayers here taken the trouble to do so.

■ But even assuming that identification by certificate number was impossible, where taxpayers act as their own custodians the regulations permit identification by designation only through the procedure of 26 C.F.R. § 1.1012–1(c)(3)(ii), namely, specification to the selling broker at the time of delivery of the certificates plus confirmation in writing by the selling broker. Appellants did not follow this procedure.

It means nothing in this context to cite (Brief, pp. 28–30) such cases as *Miller*, already noted, *Rule v. Commissioner*, 127 F.2d 979 (10th Cir. 1942), and *Fuller v. Commissioner*, 81 F.2d 176 (1st Cir. 1936). These cases were decided long before the present regulations were adopted in 1958 and are made obsolete by the present regulations.

The arguments as to "untraceable certificates" cannot be accepted.

### 9.

■ There remains an issue as to the two corporate appellants, each of which was a "personal holding company" as defined in 26 U.S.C. § 542. This issue is exceedingly complex and necessarily requires a somewhat lengthy explanation. The presentation by counsel for appellant (Brief, pp. 51–61) has been very helpful.

The tax on *undistributed* personal holding company income, as defined in 26 U.S.C. § 545, is very high (70%), this in order to force distribution by way of dividends so that the individual stockholders will be forced to pay income taxes at the individual rates which are higher than the corporate rates.

In calculating the amount of *undistributed* personal holding company income, the relevant statute (26 U.S.C. § 545(b)(1)) allows to be deducted from taxable income "Federal income . . . taxes . . . *accrued* during the taxable year . . . " (emphasis supplied). The reason for this deduction is that the "amounts paid out in taxes do not remain in the corporate coffers, enriching the stockholders while escaping the graduated personal tax rates". *Litchfield Securities Corp. v. United States*, 325 F.2d 667, 669 (2d Cir. 1963) (Friendly,

J.), *cert. denied*, 377 U.S. 931, 84 S.Ct. 1333, 12 L.Ed.2d 295 (1964).

Further, in calculating the amount of undistributed personal holding company income, the relevant statute (26 U.S.C. § 545(b)(5)) allows to be deducted from taxable income "the net capital gain for the taxable year . . . minus the taxes imposed by this subtitle *attributable* to such gain" (emphasis supplied). Judge Friendly explained in the *Litchfield* case the reason for this, as follows (325 F.2d at 669):

> The rationale of this is that, the capital gains tax rate on individuals being no higher than it is on corporations, the stockholder derives no tax advantage from realization of such profits through the corporation, but that, since § 545(b)(1) already provides for deduction of all federal income taxes paid ["accrued" is the word in the statute], the corporation would be permitted in effect to deduct the amount of its capital gains tax twice unless the deduction was reduced by the taxes "attributable" to such gain as defined in the second sentence of § 545(b)(5), the subject of this controversy.

Section 545(b)(1) of Title 26 in its present form was enacted as part of the 1954 Code. Theretofore the provision had been in the 1939 Code as 26 U.S.C. § 505(a)(1), allowing as a deduction "Federal income . . . taxes paid or accrued during the taxable year." This provision was changed in the 1954 Code because, as then explained, "it was not clear under the 1939 Code whether taxes could be deducted in the year paid or in the year accrued. The 1954 Code generally permits the deduction of taxes *only* in the year in which they accrue." (emphasis supplied). Summary of the New Provisions of the Internal Revenue Code of 1954 (prepared by the Staff of the Joint Committee on Internal Revenue Taxation) 84th Cong., 1st Sess. 76 (1955).

By the time Congress established in the 1954 Code a deduction only for taxes *accrued*, it had become firmly established that taxes which were being contested could not

be "accrued"; because they were being contested, they had not really accrued as fixed and certain liabilities. The leading case recognizing this principle was *Dixie Pine Products Co. v. Commissioner*, 320 U.S. 516, 64 S.Ct. 364, 88 L.Ed. 270 (1944). Congress was well aware of the principle when it made clear in the 1954 Code that only "accrued" taxes could be deducted in computing Undistributed Personal Holding Company Income. The Senate Report flatly stated: "The changes made in existing law include . . . an allowance of the deduction only in the taxable year in which such taxes accrue . . . . In the case of contested taxes the accrual occurs in the year the contest is resolved (*Dixie Pine Products Co. v. Commissioner*, 320 U.S. 516, 64 S.Ct. 364, 88 L.Ed. 270)." S.Rep. No. 1622, 83d Cong., 2d Sess. 320 (1954). The same passage appears in H.Rep. No. 1337, 83d Cong., 2d Sess., A177 (1954).

We may see the treatment of which the corporate appellants complain by taking as an example the computation by which the Tax Court determined a deficiency of $499,-164.73 in income taxes due from Associates for the year ended September 30, 1966.

The $499,164.73 is made up of $286,606.43 as additional taxes on the increased capital gains resulting from application of the first in-first out rule plus $212,558.30 in personal holding company tax. It is this latter amount which is the subject of our present discussion.

The $212,558.30 represents the tax at 70% on $303,654.72 Undistributed Personal Holding Company Income for the year ending 9/30/66.

The Tax Court accepted the Commissioner's computation of $303,654.72 as the Undistributed Personal Holding Company Income for the year ending 9/30/66. In this computation, no deduction was allowed under 26 U.S.C. § 545(b)(1) for the $286,606.43 in additional taxes due on the increased capital gains for the taxable year. The denial of this deduction was because the tax had not been "accrued" in the taxable year, as required by the statutory language, and could not be "accrued" under the *Dixie Pine*

principle because the tax was being contested, was in controversy. At the same time, the $286,606.43 additional taxes was used under 26 U.S.C. § 545(b)(5) to diminish the increased capital gains as a deduction in computing Undistributed Personal Holding Company Income. The diminishing of the capital gains deduction was because the $286,606.43 additional tax was "attributable" to the increased capital gains as provided by the statute.

The treatment by the Tax Court was required by the statutory language, had already been determined by one of its earlier decisions (*Ellis Corp. v. Commissioner*, 57 T.C. 520 (1972)), and had been approved in *Hart Metal Products Corp. v. Commissioner*, 437 F.2d 946 (7th Cir. 1971) (Stevens, J.).

Under the decisions of the Tax Court, the effect in the case at bar of the two deduction provisions described—one for taxes "accrued" during the taxable years and one for taxes "attributable" to capital gains long afterwards determined to have been realized—has resulted in what the corporate appellants feel is a hardship on them. There certainly is a hardship for the time being; no one can tell whether or to what extent there may be a hardship in the outcome. It may be noted that the liability for personal holding company taxes occasioned by a final decision or judgment in this matter may be avoided by the declaration of deficiency dividends in the amount of the personal holding company taxes. 26 U.S.C. § 547. Moreover, the increased capital gains taxes, while not available as deductions under 26 U.S.C. § 545(b)(1) in computing undistributed personal holding company income in the taxable years for which the taxes were assessed (because not properly "accrued" in those years), will be available in the taxable year in which they are finally adjudicated because in that year they may be properly "accrued".

The situation of the corporate appellants evokes a considerable sympathy, but the statutes compel the results and only Congress, not the judiciary, can afford them relief.

The decisions of the Tax Court are affirmed.