KENNETH E. PADGETT, JR. and BARBARA F. PADGETT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Padgett v. Commissioner
Docket No. 8458-83.
United States Tax Court
T.C. Memo 1987-130; 1987 Tax Ct. Memo LEXIS 128; 53 T.C.M. (CCH) 332; T.C.M. (RIA) 87130; March 11, 1987. *128 Held: Basis for computing gain or loss on certain sales of stock determined; loss for alleged worthlessness of shares of stock denied; negligence addition sustained; innocent spouse status determined. Kenneth E. Padgett, Jr., pro se. Clifford H. Tall, for petitioner Barbara F. Padgett. James W. Clark, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION
*129 WHITAKER, Judge: Respondent determined a deficiency in income tax for petitioners' taxable year 1980 in the amount of $8,409. By amendment to the answer respondent claimed an increase in the deficiency for the year 1980 in the amount of $6,313 and an addition to tax for negligence under section 6653(a)[1] in the amount of $736. After concessions, the issues involve the proper calculation of gain on certain transactions in shares of City Investing Company (City Investing) stock, whether shares of stock of Itel Corporation became worthless during 1980, and whether the addition to tax for negligence should be sustained. In addition, Mrs. Padgett has raised the issue of entitlement to relief as an innocent spouse under section 6013(e). The burden of proof is upon petitioners with respect to the original deficiency and on petitioner Barbara E. Padgett as to application of the innocent spouse provisions. Respondent bears the burden of proof on the increased deficiency and on the negligence addition. [2]
*130 FINDINGS OF FACT Most of the facts have been stipulated and they are so found. At the time the petition in this case was filed, each petitioner resided in Vero Beach, Florida. For the calendar year 1980 they filed a joint Federal income tax return. Mr. Padgett received a Bachelor of Science degree in Business Administration from the University of Florida as well as a law degree from the same institution. While in law school, Mr. Padgett took several courses in taxation. At the time he signed and filed the 1980 Federal income tax return Mr. Padgett was well aware of his obligations as a taxpayer to file a complete and correct Federal income tax return. Mr. and Mrs. Padgett were married in November 1977, separated in 1980, and were divorced in 1983. During the entire period of their marriage, Mr. Padgett was a practicing lawyer. He handled all of the business affairs for the family. It was his practice to prepare or cause to be prepared income tax returns which he submitted to Mrs. Padgett for her signature when necessary. Although the parties had a joint bank account, Mr. Padgett provided the funds for household expenditures through a monthly allowance to Mrs. Padgett. *131 She had no knowledge whatsoever of the transactions in corporate stock engaged in by Mr. Padgett during the year 1980 or prior thereto. Petitioners' Federal income tax return for the calendar year 1980 was filed on August 14, 1981. The return was submitted to Mrs. Padgett for her signature without any explanation by Mr. Padgett. While she was aware when she signed it that the return showed no tax liability, that raised no suspicion in Mrs. Padgett's mind notwithstanding their scale of living, since she knew that Mr. Padgett came from a wealthy family. She assumed that if he had needed money his family would have provided it. While Mrs. Padgett during this period of time was overindulging in alcohol and drugs, she was not under the influence of either at the time she signed the return. She simply had total confidence in Mr. Padgett and had no reason to believe that the return was incorrect. The Padgett's standard of living in 1980 and Mrs. Padgett's standard of living thereafter does not appear to be lavish. Until the separation agreement was executed in 1983, Mr. Padgett supported Mrs. Padgett and their children substantially as he had done prior to their separation. The *132 separation agreement divided the personal effects, provided for certain outstanding debts and for support for the children. Mrs. Padgett was given $500 per month for 3 years as rehabilitative alimony and $12,500 as a lump-sum payment. In addition, Mr. Padgett acquired a condominium in their joint names with a downpayment of $20,000. He was obligated to make certain repairs or improvements and to make mortgage payments for 5 years. Mrs. Padgett had the exclusive right to possession of the condominium until she died, remarried or cohabited with another man. She possessed a "special equity" of $20,000 and was entitled to a quit claim deed from Mr. Padgett after 3 years of exclusive occupancy. Since Mrs. Padgett was given custody of the children, this condominium also provided them with a home. At the time of trial Mrs. Padgett was employed as a reservation clerk at a motel at $4.00 per hour. On July 2, 1980, through account number R44-00700-03 of E.F. Hutton & Company, Inc. (Hutton) Mr. Padgett sold a call option on 1,000 shares of stock of City Investing with an option expiration date of January 1981, at an option price of $20 per share. The price of the option was $7.625 per *133 share. He was credited with the sum of $7,508.24 (net of commissions) on that transaction. In November 1980, the option was exercised and an account call was made for the 1,000 shares with a settlement date of November 24, 1980. On that date Mr. Padgett's account was credited with the sum of $19,730.08 (net of commissions) from the sale of that stock. In this Hutton account on November 24, 1980, the most recent purchase of City Investing shares was April 23, 1980, at which time Mr. Padgett purchased 1,200 shares with a basis of $18.2115 per share. The earliest purchase of stock remaining in that account on November 24, 1980, was made on January 13, 1978, when 1,000 shares of stock were purchased with a basis of $12,363. On this option transaction, Mr. Padgett realized the sum of $27,238.32 ($7,508.24 + $19,730.08). If Mr. Padgett's basis is the cost of the City Investing stock purchased on January 13, 1979, petitioners' long-term capital gain on account of this transaction would be $14,875.32. If his basis is the stock purchased on April 23, 1980, the gain would be $9,026.82. [3] This transaction was omitted from petitioners' 1980 income tax return. *134 On May 19, 1980, through account number 736-12748 of Merrill Lynch Pierce Fenner & Smith, Inc. (Merrill Lynch) Mr. Padgett sold a call option on 2,500 shares of City Investing stock with an expiration date of October 18, 1980, at an option price of $20 per share. The price of the option was $4 per share and Mr. Padgett was credited on May 19, 1980, with a sum of $9,714.18 (net of commissions). On September 26, 1980, this option was exercised and a call was placed on Mr. Padgett's account for 2,500 shares of City Investing stock. On October 2, 1980 (the settlement date) 2,500 shares of City Investing stock were sold at $20 per share and petitioners' account was credited with $49,362.51 (net of commissions). On September 26, 1980, Mr. Padgett directed Merrill Lynch to purchase 2,500 shares of City Investing stock to satisfy his obligation under the call option. Two thousand five hundred shares of City Investing stock were purchased on that date at $28 per share which transaction had a settlement date of October 3, 1980. On October 3, 1980, the account was debited for $70,742.82, the cost of the 2,500 shares. Merrill Lynch's records of the transaction reflect that the sale pursuant *135 to the exercise of the call option was effected by using the shares so purchased on September 26, 1980. Mr. Padgett entered into this transaction in order to avoid having to use 2,500 shares of City Investing stock which he then held in this account, sale of which would have resulted in a long-term capital gain. Petitioners claimed on their 1980 tax return a short-term capital loss in the amount of $11,666.13 from this 2,500-share transaction, the difference between the cost of the 2,500 shares purchased on September 26, 1980, and the realization from the sale of the option and the sale of the 2,500 shares. At that time, Mr. Padgett had in this account 2,500 shares of City Investing stock with an aggregate basis of $18,608.21 which stock had been purchased on various dates in 1975 and 1976. If the 2,500 shares of City Investing stock so sold on September 26, 1980, were deemed to be that stock then held in Mr. Padgett's account, petitioners would have realized a gain of $40,576.69 rather than a loss of $11,666.13. [4]
*136 In June 1979, Mr. Padgett purchased 6,000 shares of Itel Corporation stock at a cost of $62,206. The stock was maintained in account number R44-03398-14 with Hutton. During the month of December 1980, Itel Corporation was involved in a reorganization proceeding in the United States Bankruptcy Court. On December 31, 1980, petitioner sold another block of 4,000 shares of this stock held in Hutton account number R44-00700-14 at a price of $ .50 per share. Hutton could not or would not sell more than the 4,000 shares on December 31, 1980. The settlement date for the sale of the 4,000 share block was January 8, 1981. In its monthly report to Mr. Padgett as of December 31, 1980, Hutton placed a value of $1 per share on the 6,000 Itel Corporation shares. On statements for January, February, and March 1981, Hutton placed no value on such shares. For April 1981, Hutton valued such shares at $1.437 per share, and on the statements for May and June 1981, Hutton placed a value of $1.250 per share. The statement for the month of July 1981 shows a per share value of $1.125. On August 17, 1981, Mr. Padgett sold the 6,000 shares of Itel Corporation stock held in this account at a price of *137 $0.75 per share and was credited with $4,500 (without reduction for commission.) OPINION 1,000 Share Issue
Since Mr. Padgett failed to file a brief and this transaction was not reported on petitioners' 1980 income tax return, we do not know what contentions Mr. Padgett would make, if any, as to basis and thus gain. [5] We could conclude that Mr. Padgett has simply conceded the issue but we prefer to base our decision on its merits. These shares were held by Mr. Padgett's broker in a margin account. No identification was made or attempted of the City Investing shares sold on November 24, 1980. Respondent's regulations apply and plainly require application of the first-in first-out (FIFO) rule. See. 1.1012-1(c)(1), Income Tax Regs.; see, e.g., Kluger Associates, Inc. v. Commissioner,617 F.2d 323 (2d Cir. 1980), affirming in part an opinion of this Court. We hold for respondent. 2,500 Share Issue
In this instance, Mr. Padgett specifically directed his broker to purchase shares of City Investing stock to be used to satisfy the sale of that number of shares pursuant *138 to exercise of the call option. Purchase was ordered on the date on which the call option was exercised. Merrill Lynch records reflect that Mr. Padgett's instructions were carried out, which respondent concedes. Thus, there is no difficulty in this case in identifying the particular shares sold or deemed to have been sold out of one or more available blocks. Mr. Padgett gave the necessary order to his broker and it was carried out. Respondent's argument is predicated on the fact that the settlement date for the sale of the shares pursuant to exercise of the call option was October 2, 1980, whereas the settlement date for the purchase of the block of shares used to consummate that sale was one day later, on October 3, 1980. Respondent argues that a block of shares of stock held in a margin account cannot be designated or identified for sale until actually acquired and credited to the account. Thus, says respondent, the only shares which could have been used to consummate the sale were City Investing shares held in Mr. Padgett's Merrill Lynch account on October 2, 1980. Even assuming that respondent's regulations are applicable, which is far from clear, we conclude that respondent *139 misreads them. The applicable regulations are set out verbatim in the margin. [6]Section 1.1012-1(c)(1) specifies that the FIFO rule does not apply where the lot sold "can be adequately identified." Precise identification was certainly made. The broker's records show that the shares purchased on September 26, 1986, were used to consummate the sale made on that date. Thus there was adequate identification under any reasonable reading of the provisions of section 1.1012-1(c)(2), Income Tax Regs. Moreover, the requirements of subsection (3)(i) of these same regulations are also adequately satisfied. There is no reason to consider application of the FIFO rule. See Kluger Associates, Inc. v. Commissioner,supra.We hold for petitioners. *140 Itel Corporation Stock Loss
Losses are deductible under section 165 in that year "in which the loss occurs as evidenced by closed and completed transactions and as fixed by identifiable events occurring in such taxable year." Sec. 1.165-1(d), Income Tax Regs.Mere decline in the value of stock does not warrant a deduction. Secs. 1.165-4(a) and 1.165-5(f), Income Tax Regs.Determination of the year of worthlessness is a question of fact. Boehm v. Commissioner,326 U.S. 287 (1945). The facts upon which petitioners apparently relied in claiming the loss in 1980 were that Itel Corporation went into a reorganization of some sort and Mr. Padgett was able to sell only 4,000 shares out of 10,000 shares then owned. However, in fact the 6,000 shares were sold by Mr. Padgett in 1981 for $4,500, a sum of money which is not de minimis. This fact alone tends to confirm *141 that the Itel Corporation stock was not totally worthless on December 31, 1980. See, e.g., Byrd v. Commissioner,21 BTA 1183 (1931). The fact that one stock broker declined to sell or was unable to sell more than 4,000 shares on short notice does not establish worthlessness. On this issue we hold for respondent. Addition to Tax for Negligence
The addition to tax for negligence was raised by respondent for the first time in the answer. Hence, the burden of proof rests with respondent. Rule 142(a). Respondent seeks to support negligence by reason of asserted underreporting of net long-term capital gain in excess of $100,000 and net short-term gain of slightly over $18,000. Included in these net figures are the omission by petitioners of the gain on the 1,000 share City Investing transaction, approximately $1,600 of gain on one expired call option and approximately $5,000 gain on another expired call option. These omissions are unexplained. Respondent also points to the alleged error in reporting the 2,500 City Investing share transaction but we have concluded that petitioners correctly computed their loss on that block of stock. Finally, the aggregate *142 includes claiming a worthless stock loss of approximately $62,000 on Itel Corporation shares. While there may have been some basis in December 1980, and January 1981, for wondering whether the Itel Corporation stock was worthless, petitioners did not file their 1980 tax return until August 1981. For several months prior to that time the brokers had been showing a per share value on monthly reports. This alone should have alerted Mr. Padgett to the need to make some inquiry as to worthlessness. The omission to report gain on the expired call options and on the exercised City Investing option is at least prima facie evidence of negligence. Every taxpayer has an obligation to maintain records and to report transactions resulting in gross income. Mr. Padgett realized almost $34,000 of gross income from these unreported sales. He even computed the gain from the sale of one of the expired options before filing his return but still did not include it on the return. [7] The ultimate burden of proof is upon respondent but the facts in the record are sufficient for a prima facie case of negligence. *143 It was then incumbent upon Mr. Padgett to explain or excuse in some fashion the omissions. Since he did not choose to do so, we conclude that Mr. Padgett's conduct reflects either negligence or a willful intent to underreport his income. Facts justifying the negligence addition have been proven. Moreover, notwithstanding the burden of proof, we deem that Mr. Padgett by his conduct -- by not testifying on this issue and by failing to file a brief -- has conceded that the negligence addition applies. We hold for respondent. Innocent Spouse
The final issue is whether or not Mrs. Padgett is entitled to the protection of section 6013(e). The burden of proof is upon her. There is no dispute between the parties as to most of the requirements for innocent-spouse treatment. They have stipulated that there was an understatement in excess of $500 which was attributable to omissions of income and claimed deductions, credits, and basis for which there was no basis in law or fact. The entire understatement of tax is attributable to Mr. Padgett's activities, and when she signed the return, Mrs. Padgett had no actual *144 knowledge that it was erroneous. Mrs. Padgett contends that she had no reason to know or to suspect that the return was erroneous and that she did not benefit therefrom. Respondent argues to the contrary. [8]
Respondent contends that Mrs. Padgett could have reviewed the return, and if she had done so, she would have or should have understood that the adjusted gross income as reported was less than gross itemized deductions; hence she should have realized that a very substantial amount of cash had to have been generated from a nontaxable source. This, however, attributes to Mrs. Padgett a sophistication in tax return preparation which she did not have in 1980 and should not be expected to have. We are convinced that she would not have been put on actual notice of a need to inquire if she had studied the return carefully instead of merely signing it, as she did, in reliance upon her husband. The standard which we apply is "whether a reasonable person under the circumstances of the *145 taxpayer at the time of signing the return could be expected to know of the omission." Terzian v. Commissioner,72 T.C. 1164, 1170 (1979). There were no lavish expenditures in the case at bar. Respondent argues that the itemized deductions are in excess of adjusted gross income which should have alerted Mrs. Padgett. The capital gain schedule reflecting the stock market transactions consists of two pages of sales with over 50 different items. Since dates of purchase as well as dates of sale are shown, a thorough analysis might reveal whether these transactions generated a positive or a negative cash flow. Not only was Mrs. Padgett incapable of making such an analysis; we do not think it should be expected of any reasonable person under her circumstances. Moreover, without some knowledge of Mr. Padgett's liquid assets at the beginning of 1980, such an analysis would not necessarily be conclusive. Respondent also argues in a different context that the 1980 return shows capital gain income in excess of $95,000. Respondent's arguments based upon the tax return must have some consistency. If the $95,000 could have been a source for transferring a benefit to Mrs. *146 Padgett in 1983, it would have also provided ample cash for the nondeductible living expenses in 1980. A more difficult question is presented by the final test of whether under the particular facts it is inequitable to hold Mrs. Padgett liable for the underpayment. To answer this requirement, we must determine whether she substantially benefited from the omitted income. Benefit may be found from transfers of property in later years if derived from omitted income but not to the extent that funds or property transferred constitute reasonable support. Terzian v. Commissioner,supra;Quave v. Commissioner,T.C. Memo. 1985-7. Respondent contends that under the 1983 property settlement Mrs. Padgett received a $20,000 equity in a condominium provided as the home for herself and petitioners' children. He further contends that this $20,000 must have been accumulated in whole or in part in 1980. There are several weaknesses in this argument. A person claiming *147 the benefit of innocent-spouse treatment is not required to explain the source of every payment received in a divorce proceeding in a subsequent year. It is pure speculation that some part of the $20,000 was derived from 1980 omitted income, especially when that return also reported more than $95,000 of reported capital gains as respondent argues. There were many possible sources of the $20,000 condominium down payment in 1983 other than 1980 omitted income of about $34,000. Also, clear title to the condominium was not transferred to Mrs. Padgett in 1983. She merely had the right to acquire Mr. Padgett's interest by living there for 3 years. Neither Mrs. Padgett's counsel nor respondent's counsel has attempted to explain the significance of the "special equity" in the $20,000. However, the provision of a modest residence for a former wife and children does little more than discharge the husband's marital obligations. Even if we assume that the special equity gave Mrs. Padgett the right to $20,000 out of the proceeds of sale of the condominium if sold prior to the transfer to her of Mr. Padgett's interest, and if we further assume that the $20,000 came in part from the 1980 omitted *148 income [9], we, nevertheless, conclude that Mrs. Padgett received no more under the separation agreement than normal support. Terzian v. Commissioner,supra.Under all the facts and circumstances of this case, it would be inequitable to hold Mrs. Padgett liable for the underpayment of tax for the year 1980. See, e.g., Feingold v. Commissioner,T.C. Memo. 1980-163; Gurr v. Commissioner,T.C. Memo. 1976-338. Decision will be entered for petitioner Barbara F. Padgett and under Rule 155 as to Kenneth E. Padgett, Jr.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Neither Mr. Padgett nor respondent has explained the precise adjustments which result in increasing petitioners' underreported capital gain income from $34,550.57 to $48,664.04 as alleged in the amendment to answer filed by respondent. Comparison of petitioners' 1980 income tax return, the statutory notice, and respondent's amendment to answer has not enabled us to solve this question. Our uncertainty has not been assisted by the failure of Mr. Padgett to file a brief. However, the record in this case contains sufficient facts to permit our resolution of the contested issues on their respective merits without reference to the burden of proof.↩
3. On brief respondent computes the gain based on the April 23, 1980, purchase in the amount of $9,027.17. The discrepancy is immaterial. Petitioners failed to file a brief.↩
4. $9,714.18 + $49,362.51 = $59,076.69; $70,742.82 - $59,076.69 = ($11,666.13); $59,076.69 - $18,608.21 = $40,468.48. In respondent's amended answer, Mr. Padgett's basis in the City Investing stock acquired prior to 1980 is alleged to be $18,500. The parties have stipulated to the amount used in the text.↩
5. Mrs. Padgett is asserting through her counsel only the innocent-spouse issue.↩
6. Section 1.1012-1, Income Tax Regs.
(c) Sale of stock. (1) In general. If shares of stock in a corporation are sold or transferred by a taxpayer who purchased or acquired lots of stock on different dates or at different prices, and the lot from which the stock was sold or transferred cannot be adequately identified, the stock sold or transferred shall be charged against the earliest of such lots purchased or acquired in order to determine the cost or other basis of such stock and in order to determine the holding period of such stock for purposes of subchapter P, chapter 1 of the Code. If, on the other hand, the lot from which the stock is sold or transferred can be adequately identified, the rule stated in the preceding sentence is not applicable. As to what constitutes "adequate identification", see subparagraphs (2), (3), and (4) of this paragraph. (2) Identification of stock. An adequate identification is made if it is shown that certificates representing shares of stock from a lot which was purchased or acquired on a certain date or for a certain price were delivered to the taxpayer's transferee. Except as otherwise provided in subparagraphs (3) or (4) of this paragraph, such stock certificates delivered to the transferee constitute the stock sold or transferred by the taxpayer. Thus, unless the requirements of subparagraphs (3) or (4) of this paragraph are met, the stock sold or transferred is charged to the lot to which the certificates delivered to the transferee belong, whether or not the taxpayer intends, or instructs his broker or other agent, to sell or transfer stock from a lot purchased or acquired on a different date or for a different price. (3) Identification on confirmation documents. (i) Where the stock is left in the custody of a broker or other agent, an adequate identification is made if -- (a) At the time of the sale or transfer, the taxpayer specifies to such broker or other agent having custody of the stock the particular stock to be sold or transferred, and (b) Within a reasonable time thereafter, confirmation of such specification is set forth in a written document from such broker or other agent. Stock identified pursuant to this subdivision is the stock sold or transferred by the taxpayer, even though stock certificates from a different lot are delivered to the taxpayer's transferee.↩
7. Mr. Padgett so testified with no explanation for this error.↩
8. On brief respondent concedes that these are the only aspects of section 6013(e)↩ which are in issue.
9. The burden of proof is upon Mrs. Padgett. Rule 142(a).↩